# SMITH, JUDGE, ET AL. *v.* DAILY MAIL PUBLISHING CO. ET AL.

No. 78–482.  Argued March 20, 1979—Decided June 26, 1979

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. REHNQUIST, J., filed an opinion concurring in the judgment, *post*, p. 106. POWELL, J., took no part in the consideration or decision of the case.

*Cletus B. Hanley,* Special Assistant Attorney General of West Viriginia, argued the cause for petitioners. With him on the brief were *Chauncey H. Browning,* Attorney General, and *Betty L. Caplan,* Special Assistant Attorney General.

*Floyd Abrams* argued the cause for respondents. With him on the brief were *Dean Ringel, F. Paul Chambers, Michael A. Albert,* and *Rudolph L. Di Trapano.* *

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether a West Virginia statute violates the First and Fourteenth Amendments of the United States Constitution by making it a crime for a newspaper to publish, without the written approval of the juvenile court, the name of any youth charged as a juvenile offender.

(1)

The challenged West Virginia statute provides:

"[N]or shall the name of any child, in connection with any proceedings under this chapter, be published in any newspaper without a written order of the court. . . ." W. Va. Code § 49–7–3 (1976);

and:

"A person who violates . . . a provision of this chapter for which punishment has not been specifically provided,

---

*Paul Raymond Stone* filed a brief for the Juvenile Defender Attorney Program et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Bruce J. Ennis* for the American Civil Liberties Union; by *Arthur B. Hanson* and *Frank M. Northam* for the American Newspaper Publishers Association; by

shall be guilty of a misdemeanor, and upon conviction shall be fined not less than ten nor more than one hundred dollars, or confined in jail not less than five days nor more than six months, or both such fine and imprisonment." § 49–7–20.

On February 9, 1978, a 15-year-old student was shot and killed at Hayes Junior High School in St. Albans, W. Va., a small community located about 13 miles outside of Charleston, W. Va. The alleged assailant, a 14-year-old classmate, was identified by seven different eyewitnesses and was arrested by police soon after the incident.

The Charleston Daily Mail and the Charleston Gazette, respondents here, learned of the shooting by monitoring routinely the police band radio frequency; they immediately dispatched reporters and photographers to the junior high school. The reporters for both papers obtained the name of the alleged assailant simply by asking various witnesses, the police, and an assistant prosecuting attorney who were at the school.

The staffs of both newspapers prepared articles for publication about the incident. The Daily Mail's first article appeared in its February 9 afternoon edition. The article did not mention the alleged attacker's name. The editorial decision to omit the name was made because of the statutory prohibition against publication without prior court approval.

The Gazette made a contrary editorial decision and published the juvenile's name and picture in an article about the shooting that appeared in the February 10 morning edition of the paper. In addition, the name of the alleged juvenile attacker was broadcast over at least three different radio stations on February 9 and 10. Since the information had be-

*Richard M. Schmidt, Jr.*, and *Ian D. Volner* for the American Society of Newspaper Editors et al.; and by *Don H. Reuben, Lawrence Gunnels*, and *James A. Klenk* for the Chicago Tribune Co.

come public knowledge, the Daily Mail decided to include the juvenile's name in an article in its afternoon paper on February 10.

On March 1, an indictment against the respondents was returned by a grand jury. The indictment alleged that each knowingly published the name of a youth involved in a juvenile proceeding in violation of W. Va. Code § 49–7–3 (1976). Respondents then filed an original-jurisdiction petition with the West Virginia Supreme Court of Appeals, seeking a writ of prohibition against the prosecuting attorney and the Circuit Court Judges of Kanawha County, petitioners here. Respondents alleged that the indictment was based on a statute that violated the First and Fourteenth Amendments of the United States Constitution and several provisions of the State's Constitution and requested an order prohibiting the county officials from taking any action on the indictment.

The West Virginia Supreme Court of Appeals issued the writ of prohibition. —— W. Va. ——, 248 S. E. 2d 269 (1978). Relying on holdings of this Court, it held that the statute abridged the freedom of the press. The court reasoned that the statute operated as a prior restraint on speech and that the State's interest in protecting the identity of the juvenile offender did not overcome the heavy presumption against the constitutionality of such prior restraints.

We granted certiorari. 439 U. S. 963 (1978).

## (2)

Respondents urge this Court to hold that because § 49–7–3 requires court approval prior to publication of the juvenile's name it operates as a "prior restraint" on speech.[1] See *Ne-*

---

[1] Respondents do not argue that the statute is a prior restraint because it imposes a criminal sanction for certain types of publication. At page 11 of their brief they state: "The statute in question is, to be sure, not a prior restraint because it subjects newspapers to criminal punishments for what they print" after the event.

So far as the Daily Mail was concerned, the statute operated as a deter-

*braska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976); *New York Times Co.* v. *United States,* 403 U. S. 713 (1971); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971); *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931). Respondents concede that this statute is not in the classic mold of prior restraint, there being no prior injunction against publication. Nonetheless, they contend that the prior-approval requirement acts in "operation and effect" like a licensing scheme and thus is another form of prior restraint. See *Near* v. *Minnesota ex rel. Olson, supra,* at 708. As such, respondents argue, the statute bears "a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin* v. *Keefe, supra,* at 419. They claim that the State's interest in the anonymity of a juvenile offender is not sufficient to overcome that presumption.

Petitioners do not dispute that the statute amounts to a prior restraint on speech. Rather, they take the view that even if it is a prior restraint the statute is constitutional because of the significance of the State's interest in protecting the identity of juveniles.

## (3)

The resolution of this case does not turn on whether the statutory grant of authority to the juvenile judge to permit publication of the juvenile's name is, in and of itself, a prior restraint. First Amendment protection reaches beyond prior restraints, *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829 (1978); *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975), and respondents acknowledge that the statutory provision for court approval of disclosure actually may have a less oppressive effect on freedom of the press than a total ban on the publication of the child's name.

Whether we view the statute as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful in-

rent for 24 hours and became the basis for a prosecution after the delayed publication.

formation is not dispositive because even the latter action requires the highest form of state interest to sustain its validity. Prior restraints have been accorded the most exacting scrutiny in previous cases. See *Nebraska Press Assn.* v. *Stuart, supra,* at 561; *Organization for a Better Austin* v. *Keefe, supra,* at 419; *Near* v. *Minnesota ex rel. Olson, supra,* at 716. See also *Southeastern Promotions, Ltd.* v. *Conrad,.* 420 U. S. 546 (1975). However, even when a state attempts to punish publication after the event it must nevertheless demonstrate that its punitive action was necessary to further the state interests asserted. *Landmark Communications, Inc.* v. *Virginia, supra,* at 843. Since we conclude that this statute cannot satisfy the constitutional standards defined in *Landmark Communications, Inc.,* we need not decide whether, as argued by respondents, it operated as a prior restraint.

Our recent decisions demonstrate that state action to punish the publication of truthful information seldom can satisfy constitutional standards. In *Landmark Communications* we declared unconstitutional a Virginia statute making it a crime to publish information regarding confidential proceedings before a state judicial review commission that heard complaints about alleged disabilities and misconduct of state-court judges. In declaring that statute unconstitutional, we concluded:

> "[T]he publication Virginia seeks to punish under its statute lies near the core of the First Amendment, and the Commonwealth's interests advanced by the imposition of criminal sanctions are insufficient to justify the actual and potential encroachments on freedom of speech and of the press which follow therefrom." 435 U. S., at 838.

In *Cox Broadcasting Corp.* v. *Cohn, supra,* we held that damages could not be recovered against a newspaper for publishing the name of a rape victim. The suit had been based on a state statute that made it a crime to publish the name of the victim; the purpose of the statute was

to protect the privacy right of the individual and the family. The name of the victim had become known to the public through official court records dealing with the trial of the rapist. In declaring the statute unconstitutional, the Court, speaking through MR. JUSTICE WHITE, reasoned:

> "By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. . . . States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection." 420 U. S., at 495.

One case that involved a classic prior restraint is particularly relevant to our inquiry. In *Oklahoma Publishing Co.* v. *District Court,* 430 U. S. 308 (1977), we struck down a state-court injunction prohibiting the news media from publishing the name or photograph of an 11-year-old boy who was being tried before a juvenile court. The juvenile court judge had permitted reporters and other members of the public to attend a hearing in the case, notwithstanding a state statute closing such trials to the public. The court then attempted to halt publication of the information obtained from that hearing. We held that once the truthful information was "publicly revealed" or "in the public domain" the court could not constitutionally restrain its dissemination.

None of these opinions directly controls this case; however, all suggest strongly that if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order. These cases involved situations where the government itself provided or made possible press access to the information. That factor is not controlling. Here respondents relied upon routine newspaper reporting techniques to ascertain the identity of the alleged assailant.

A free press cannot be made to rely solely upon the sufferance of government to supply it with information. See *Houchins* v. *KQED, Inc.,* 438 U. S. 1, 11 (1978) (plurality opinion); *Branzburg* v. *Hayes,* 408 U. S. 665, 681 (1972). If the information is lawfully obtained, as it was here, the state may not punish its publication except when necessary to further an interest more substantial than is present here.

### (4)

The sole interest advanced by the State to justify its criminal statute is to protect the anonymity of the juvenile offender. It is asserted that confidentiality will further his rehabilitation because publication of the name may encourage further antisocial conduct and also may cause the juvenile to lose future employment or suffer other consequences for this single offense. In *Davis* v. *Alaska,* 415 U. S. 308 (1974), similar arguments were advanced by the State to justify not permitting a criminal defendant to impeach a prosecution witness on the basis of his juvenile record. We said there that "[w]e do not and need not challenge the State's interest as a matter of its own policy in the administration of criminal justice to seek to preserve the anonymity of a juvenile offender." *Id.,* at 319. However, we concluded that the State's policy must be subordinated to the defendant's Sixth Amendment right of confrontation. *Ibid.* The important rights created by the First Amendment must be considered along with the rights of defendants guaranteed by the Sixth Amendment. See *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 561.. Therefore, the reasoning of *Davis* that the constitutional right must prevail over the state's interest in protecting juveniles applies with equal force here.

The magnitude of the State's interest in this statute is not sufficient to justify application of a criminal penalty to respondents. Moreover, the statute's approach does not satisfy constitutional requirements. The statute does not restrict

the electronic media or any form of publication, except "newspapers," from printing the names of youths charged in a juvenile proceeding. In this very case, three radio stations announced the alleged assailant's name before the Daily Mail decided to publish it. Thus, even assuming the statute served a state interest of the highest order, it does not accomplish its stated purpose.

In addition, there is no evidence to demonstrate that the imposition of criminal penalties is necessary to protect the confidentiality of juvenile proceedings. As the Brief for Respondents points out at 29 n. **, all 50 states have statutes that provide in some way for confidentiality, but only 5, including West Virginia,[2] impose criminal penalties on nonparties for publication of the identity of the juvenile. Although every state has asserted a similar interest, all but a handful have found other ways of accomplishing the objective. See *Landmark Communications, Inc.* v. *Virginia,* 435 U. S., at 843.[3]

### (5)

Our holding in this case is narrow. There is no issue before us of unlawful press access to confidential judicial proceedings, see *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S., at 496 n. 26; there is no issue here of privacy or prejudicial pretrial publicity. At issue is simply the power of a state

---

[2] Colo. Rev. Stat. § 19–1–107 (6) (1973); Ga. Code § 24A–3503 (g) (1) (1978); N. H. Rev. Stat. Ann. § 169:27–28 (1977); S. C. Code § 14–21–30 (1976).

[3] The approach advocated by the National Council of Juvenile Court Judges is based on cooperation between juvenile court personnel and newspaper editors. It is suggested that if the courts make clear their purpose and methods then the press will exercise discretion and generally decline to publish the juvenile's name without some prior consultation with the juvenile court judge. See Conway, Publicizing the Juvenile Court: A Public Responsibility, 16 Juv. Ct. Judges J. 21, 21–22 (1965); Riederer, Secrecy or Privacy? Communication Problems in the Juvenile Court Field, 17 J. Mo. Bar 66, 69–70 (1961).

to punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper.[4] The asserted state interest cannot justify the statute's imposition of criminal sanctions on this type of publication. Accordingly, the judgment of the West Virginia Supreme Court of Appeals is

*Affirmed.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. JUSTICE REHNQUIST, concurring in the judgment.

Historically, we have viewed freedom of speech and of the press as indispensable to a free society and its government. But recognition of this proposition has not meant that the public interest in free speech and press always has prevailed over competing interests of the public. "Freedom of speech thus does not comprehend the right to speak on any subject at any time," *American Communications Assn.* v. *Douds,* 339 U. S. 382, 394 (1950), and "the press is not free to publish with impunity everything and anything it desires to publish." *Branzburg* v. *Hayes,* 408 U. S. 665, 683 (1972); see *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697, 708, 716 (1931). While we have shown a special solicitude for freedom of speech and of the press, we have eschewed absolutes in favor of a more delicate calculus that carefully weighs the conflicting interests to determine which demands the greater protection under the particular circumstances presented. *E. g., Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829, 838, 843 (1978); *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 562 (1976); *American Communications Assn.* v. *Douds, supra,* at 400.

---

[4] In light of our disposition of the First and Fourteenth Amendment issue, we need not reach respondents' claim that the statute violates equal protection by being applicable only to newspapers but not other forms of journalistic expression.

The Court does not depart from these principles today. See *ante,* at 103–104. Instead, it concludes that the asserted state interest is not sufficient to justify punishment of publication of truthful, lawfully obtained information about a matter of public significance. *Ante,* at 104. So valued is the liberty of speech and of the press that there is a tendency in cases such as this to accept virtually any contention supported by a claim of interference with speech or the press. See *Jones* v. *Opelika,* 316 U. S. 584, 595 (1942). I would resist that temptation. In my view, a State's interest in preserving the anonymity of its juvenile offenders—an interest that I consider to be, in the words of the Court, of the "highest order"—far outweighs any minimal interference with freedom of the press that a ban on publication of the youths' names entails.

It is a hallmark of our juvenile justice system in the United States that virtually from its inception at the end of the last century its proceedings have been conducted outside of the public's full gaze and the youths brought before our juvenile courts have been shielded from publicity. See H. Lou, Juvenile Courts in the United States 131–133 (1927); Geis, Publicity and Juvenile Court Proceedings, 30 Rocky Mt. L. Rev. 101, 102, 116 (1958). This insistence on confidentiality is born of a tender concern for the welfare of the child, to hide his youthful errors and " 'bury them in the graveyard of the forgotten past.' " *In re Gault,* 387 U. S. 1, 24–25 (1967). The prohibition of publication of a juvenile's name is designed to protect the young person from the stigma of his misconduct and is rooted in the principle that a court concerned with juvenile affairs serves as a rehabilitative and protective agency of the State. National Advisory Committee on Criminal Justice Standards and Goals, Juvenile Justice and Delinquency Prevention, Standard 5.13, pp. 224–225 (1976); see *Davis* v. *Alaska,* 415 U. S. 308, 319 (1974); *Kent* v. *United States,* 383 U. S. 541, 554–555 (1966). Publication of the names of juvenile offenders may seriously impair the rehabilitative goals of

the juvenile justice system and handicap the youths' prospects for adjustment in society and acceptance by the public. E. Eldefonso, Law Enforcement and the Youthful Offender 166 (3d ed. 1978). This exposure brings undue embarrassment to the families of youthful offenders and may cause the juvenile to lose employment opportunities or provide the hardcore delinquent the kind of attention he seeks, thereby encouraging him to commit further antisocial acts. *Davis* v. *Alaska, supra,* at 319. Such publicity also renders nugatory States' expungement laws, for a potential employer or any other person can retrieve the information the States seek to "bury" simply by visiting the morgue of the local newspaper. The resultant widespread dissemination of a juvenile offender's name, therefore, may defeat the beneficent and rehabilitative purposes of a State's juvenile court system.[1]

By contrast, a prohibition against publication of the names of youthful offenders represents only a minimal interference with freedom of the press. West Virginia's statute, like similar laws in other States, prohibits publication only of the name of the young person. See W. Va. Code § 49–7–3 (1976). The press is free to describe the details of the offense and inform the community of the proceedings against the juvenile. It is difficult to understand how publication of the youth's name is in any way necessary to performance of the press' "watch-

---

[1] That publicity may have a harmful impact on the rehabilitation of a juvenile offender is not mere hypothesis. Recently, two clinical psychologists conducted an investigation into the effects of publicity on a juvenile. They concluded that publicity "placed additional stress on [the juvenile] during a difficult period of adjustment in the community, and it interfered with his adjustment at various points when he was otherwise proceeding adequately." Howard, Grisso, & Neems, Publicity and Juvenile Court Proceedings, 11 Clearinghouse Rev. 203, 210 (1977). Publication of the youth's name and picture also led to confrontations between the juvenile and his peers while he was in detention. *Ibid.* While this study obviously is not controlling, it does indicate that the concerns that prompted enactment of state laws prohibiting publication of the names of juvenile offenders are not without empirical support.

. dog" role. In those rare instances where the press believes it is necessary to publish the juvenile's name, the West Virginia law, like the statutes of other States, permits the juvenile court judge to allow publication. The juvenile court judge, unlike the press, is capable of determining whether publishing the name of the particular young person will have a deleterious effect on his chances for rehabilitation and adjustment to society's norms.[2]

Without providing for punishment of such unauthorized publications it will be virtually impossible for a State to ensure the anonymity of its juvenile offenders. Even if the juvenile court's proceedings and records are closed to the public, the press still will be able to obtain the child's name in the same manner as it was acquired in this case. *Ante*, at 99; Tr. of Oral Arg. 34. Thus, the Court's reference to effective alternatives for accomplishing the State's goals is a mere chimera. The fact that other States do not punish publication of the names of juvenile offenders, while relevant,

---

[2] The Court relies on *Davis* v. *Alaska*, 415 U. S. 308 (1974). *Ante*, at 104. But *Davis*, which presented a clash between the interests of the State in affording anonymity to juvenile offenders and the defendant's Sixth Amendment right of confrontation, does not control the disposition of this case. In *Davis*, where the defendant's liberty was at stake, the Court stated that "[s]erious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry [related to the juvenile offender's record]." 415 U. S., at 319. The State also could have protected the youth from exposure by not using him to make out its case. *Id.*, at 320. By contrast, in this case the State took every step that was in its power to protect the juvenile's name, and the minimal interference with the freedom of the press caused by the ban on publication of the youth's name can hardly be compared with the possible deprivation of liberty involved in *Davis*. Because in each case we must carefully balance the interest of the State in pursuing its policy against the magnitude of the encroachment on the liberty of speech and of the press that the policy represents, it will not do simply to say, as the Court does, that the "important rights created by the First Amendment must be considered along with the rights of defendants guaranteed by the Sixth Amendment." *Ante*, at 104.

certainly is not determinative of the requirements of the Constitution.

Although I disagree with the Court that a state statute punishing publication of the identity of a juvenile offender can never serve an interest of the "highest order" and thus pass muster under the First Amendment, I agree with the Court that West Virginia's statute "does not accomplish its stated purpose." *Ante,* at 105. The West Virginia statute prohibits only newspapers from printing the names of youths charged in juvenile proceedings. Electronic media and other forms of publication can announce the young person's name with impunity. In fact, in this case three radio stations broadcast the alleged assailant's name before it was published by the Charleston Daily Mail. *Ante,* at 99. This statute thus largely fails to achieve its purpose.[3]   It is difficult to take very seriously West Virginia's asserted need to preserve the anonymity of its youthful offenders when it permits other, equally, if not more, effective means of mass communication to distribute this information without fear of punishment. See *Branzburg* v. *Hayes,* 408 U. S., at 700; *Bates* v. *Little Rock,* 361 U. S. 516, 525 (1960). I, therefore, join in the Court's judgment striking down the West Virginia law. But for the reasons previously stated, I think that a generally effective ban on publication that applied to all forms of mass communication, electronic and print media alike, would be constitutional.

---

[3] I believe that an obvious failure of a state statute to achieve its purpose is entitled to considerable weight in the balancing process that is employed in deciding issues arising under the First and Fourteenth Amendment protections accorded freedom of expression. But for the reasons stated in my dissent in *Trimble* v. *Gordon,* 430 U. S. 762, 777 (1977), I think a similar inquiry into whether a statute "accomplishes its purpose" is illusory when the statute is challenged on the basis of the Equal Protection Clause of the Fourteenth Amendment.