OPINION OF THE COURT
Edward J. McLaughlin, J.
When a case is removed to the Family Court after the verdict of a jury has been vacated, the hearing that is held in the Family Court is essentially a civil sentencing since respondent has been found to be a juvenile delinquent (or adjudicated) prior to the removal of the case to the Family Court. (CPL 310.85, subd 3.) Accordingly, the purpose of the hearing held by the Family Court is to determine what disposition is appropriate under section 753 of the Family Court Act. This is so in spite of the fact that respondent’s need for treatment and supervision has never actually been established.
The underlying facts of the present case were found by a jury. On the morning of February 17,1982, Amanda Metot, a two- and a half year-old baby girl, was found dead in her *258 crib. Dudley Williams, respondent herein, was indicted for her murder. He was tried by a jury in County Court.
The verdict of the jury was that while Dudley Williams was hot guilty of murder, he was guilty of criminally negligent homicide.[1] In New York State a person under 16 years of age cannot be found liable for the crime of criminally negligent homicide, because the Legislature has deemed that a person under the age of 16 is incapable of forming the necessary intent to commit any crime but those crimes particularly specified by the Legislature. (Penal Law, § 10.00, subd 18; § 30.00, subd 2.)
The jury verdict of guilty was deemed vacated and was replaced by a juvenile delinquency fact determination and the matter was ordered removed to the Family Court. (CPL 310.85, subds 1, 3; art 725.) Thus, essentially, the criminal court procedure took the place of the Family Court fact-finding and dispositional hearing. (Family Ct Act, § 712, subds [f], [g]; § 731, subd 3; § 742, subd 1, par [i]; § 744, subd [c]; § 746.)
Unfortunately, this case highlights the incoherent nature of the present law in New York as it concerns young persons who commit violent antisocial acts. Respondent is before this court at this time pursuant to the provisions of the Juvenile Justice Reform Amendment of 1978 (L 1978, ch 478). This law, which has been characterized as a “misguided remedy for a tormenting problem” (New York Times, Aug. 20, 1980, p 18, col 1) provides that when a young person is arrested for certain acts, including murder in the second degree (Penal Law, § 10.00, subd 18; § 30.00, subd 2) that the young person may be tried in the criminal court. If, however, the young person is found not guilty of a juvenile offense, even if the jury finds the young person guilty of some other crime, the case is ordered removed to the Family Court. (CPL 310.85, subd 3; art 725.) The Juvenile Justice Reform Amendment of 1978, which has been previously commented upon by this court (see, e.g., *259 Whisenand and McLaughlin, Completing the Cycle: Reality and the Juvenile Justice System in New York State, 47 Albany L Rev 1), articulates the public policy of the State. It is the sworn duty of this court to uphold the law.
Unfortunately the scheme devised by the Legislature for handling matters such as the case at bar is so full of legal fictions that a proceeding such as this one approaches the fantastic. Even though a jury finds a person guilty of a violent antisocial act, the law requires that the jury verdict be vacated unless the crime is one of those enumerated. Thus, in a legal sense, the verdict never happened. To fill this vacuum, the legislative scheme provides that another event which never happened occurred — that there was a fact determination of juvenile delinquency. (CPL 310.85, subd 3.)
Before the Family Court can make a finding that a person is a juvenile delinquent, both a fact-finding hearing (Family Ct Act, § 712, subd [f]) and a dispositional hearing (Family Ct Act, § 712, subd [g]) must be held and the allegations in the petition alleging juvenile delinquency established. (Family Ct Act, § 752.) A juvenile delinquency petition must allege that the respondent did an act which would be a crime if done by an adult, what that act was, when and where it was done, the age of the respondent and that the respondent requires supervision, treatment or confinement. (Family Ct Act, § 731, subd 1.) The section of the Family Court Act allowing commitment, however (Family Ct Act, § 758), was repealed by the Legislature in 1976. (L 1976, ch 878.) Thus, commitment is not a remedy available to this court.
One legal fiction is that an order of removal is deemed to contain all of the allegations in a juvenile delinquency petition, “notwithstanding that such allegations may not be set forth in the manner * * * prescribed.” (Family Ct Act, § 731, subd 3.) While this fiction may be workable when a proceeding is ordered removed during a preliminary procedural stage (CPL 220.10) it does not work for a removal after verdict. Here the question of respondent’s need for supervision or treatment was never put to the jury. In spite of this respondent was found to be a juvenile delinquent.
*260 All the elements of juvenile delinquency petitions must be proved beyond a reasonable doubt in a juvenile delinquency proceeding. (Family Ct Act, § 731, subd 1.) If all of the allegations in a juvenile delinquency petition, including the need for supervision, treatment and confinement are not established, the Family Court “shall dismiss the petition.” (Family Ct Act, § 751; see Matter of Robert M., 110 Misc 2d 113,117.) Here, the order of removal contained a finding of juvenile delinquency. Thus, even though the jury never heard evidence as to respondent’s need for supervision, treatment, or confinement, this court must presume that a finding was made that respondent is, at least, in need of treatment.
Since the finding of juvenile delinquency has been made by the criminal court, the function of this court upon removal, is essentially to impose a civil “sentence”. While the constitutionality of such a civil sentence may be questioned, respondent has had full due process of law in the criminal court, including a trial by jury.
This court now has five alternatives available to it. (Family Ct Act, § 753.) The court may enter an order of disposition:
1. suspending judgment (Family Ct Act, § 755);
2. continuing the proceeding and placing respondent with:
a. his parents
b. the Commissioner of Social Services, or
c. the Division for Youth (Family Ct Act, § 756, subd [a]);
3. putting respondent on probation (Family Ct Act, § 757);
4. continuing the proceeding and placing respondent in restrictive placement if respondent has been found to be a designated felon[2] (Family Ct Act, § 735-a);
5. placing respondent with the Commissioner of Social Services for replacement with the Department of Mental Health, when the need for such placement is established.[2] (Family Ct Act, § 760.)
*261 These alternatives can only be used if the evidence presented to the court establishes that one or another of the alternatives is an appropriate placement for a particular respondent.
Here, no evidence was presented to the court that respondent was in need of placement. The law requires that evidence be received as to suitability of a particular agency to which respondent should be referred. Here, no evidence was offered that respondent should be placed with a parent or other suitable person or be placed with the Commissioner of Social Services or with the Division for Youth. The only reference to placement was the statement in Dr. Rachiele’s report that “placement in a residential treatment center is suggested.” This suggestion was a conclusion that was not supported by specifics. The suggestion was rejected by the investigative probation officer and by the psychiatrist retained by the county. Indeed, the psychiatrist gave specific reasons why residential treatment was not called for in this matter. Were this court to accept Dr. Rachiele’s suggestion, its placement would have to be either to the Commissioner of Social Services or to the Division for Youth. (Family Ct Act, § 756, subd [a].) The Rachiele report is totally devoid of guidance as to which of these two possibilities the court should select. Absent such evidence the court finds placement to be an alternative totally beyond its power, since the power of the Family Court is limited by statute. (Matter of Thomson, 79 AD2d 880; Matter of Borkowski v Borkowski, 38 AD2d 752; NY Const, art VI, § 13, subd b.) Accordingly, by a process of elimination it is clear that the only dispositional alternatives available to the court are that of a suspended sentence or probation. The court elects probation as being the single alternative available to it which is most likely to protect the community and to afford respondent the treatment to which he is constitutionally entitled. The legal basis for this choice follows.
The goal of the juvenile court is to rehabilitate the child. (See, e.g., McKeiver v Pennsylvania, 403 US 528 [plurality opn].) As noted by the United States Supreme Court in the landmark case of Matter of Gault (387 US 1,15-16, quoting Mack, The Juvenile Court, 23 Harv L Rev 104, 120), with *262 the creation of a separate juvenile court, “[t]he idea of crime and punishment was to be abandoned. The child was to be ‘treated’ and ‘rehabilitated’ and the procedures, from apprehension through institutionalization, were to be ‘clinical’ rather than putative.”
Historically, of course, a child who was found to have committed a violent act was tried, convicted, and sentenced in the criminal court. Sometimes the sentence was death. (See, e.g., de Waldborough’s Case, 1 Hall 26 [where a girl of 13 was burned alive for killing her mistress].) The English common-law tradition of treating young criminal offenders in the same manner as adult criminals was carried over to the American colonies. (See Fox, Juvenile Justice Reform: An Historical Perspective, 22 Stan L Rev 1187.) No distinction was made between young and old either as to the constitutional criminal procedure to which they were entitled, or, after the 19th century, as to the places in which they were incarcerated.[3]
Here, but for respondent’s infancy, he would be subject to punishment for the act in which he engaged. Since, however, he was under 16 at the time of the incident, our laws require that he be sentenced not as a criminal, but rather that he be dealt with as a juvenile delinquent, a person entitled to “treatment”.
It has been held by Federal courts that a juvenile delinquent has a constitutional right to treatment. (Martarella v Kelley, 349 F Supp 575 [SDNY, 1972]; Inmates of Boys’ Training School v Affleck, 346 F Supp 1354.) Indeed, it has been held that the right to treatment is a “right to individualized care and treatment.” (Nelson v Heyne, 491 F2d 352, 360, cert den 417 US 976.)
The trial court is required to explore suitable dispositions for individual respondents. (See Matter of Cecil L., 71 AD2d 917, mot for lv to opp dsmd 48 NY2d 755.) It has been found to be reversible error for a trial court to restrictively place a juvenile delinquent when the weight of the evidence indicates that another disposition is more appro *263 priate. (Matter of Cecil L., supra; Matter of John H., 48 AD2d 879; cf. Matter of Richard C., 43 AD2d 862.) “Restrictive placement should only be used as a last resort”. (Matter of Cecil L., supra, at pp 917-918.)
Under present New York law the court is also required to consider the need for protection of the community as well as the needs and best interests of the respondent. (Family Ct Act, § 711.) Here, one little child is dead. Respondent was directly involved in the events leading to the child’s tragic death according to a jury verdict after a trial in criminal court. Obviously, society needs to be protected from any future acts of negligence that respondent might commit.
In order to determine what disposition would be suitable in light of all of the factors set forth, this court held a hearing. Four witnesses testified and four exhibits were introduced into evidence.[4] The procedural history of the case is set forth below.[5] Due to the attention that the public trial on this matter attracted and the great public interest in this matter, the press sought admission to the proceeding. The court initially had to determine if, in light of the United States Supreme Court decision in Smith v Daily Mail Pub. Co. (443 US 97), and Richmond Newspapers u Virginia (448 US 555), the press should be excluded from the courtroom pursuant to subdivision (b) of section 741_of *264 the Family Court Act. In view of the fact that the “fact-finding” hearing in this matter had been held in an open criminal court and had been widely reported and that the finding of guilt as to criminally negligent homicide had been legally obtained by the press and third persons, the court allowed the press to remain over the objection of respondent’s attorney. The court advised the representatives of the press, however, that the name, address, photograph, or any other representation that was likely to identify respondent could not be made, publicly or privately. (22 NYCRR 2501.2 [c].) The representative of the press agreed to be bound by this “gag rule”. This agreement freed the court from the burden of deciding the constitutionality of such a limitation on the freedom of the press in proceedings of this nature.
No clear and cohesive treatment plan emerged from the evidence introduced at the hearing. It was clear from the evidence, however, that respondent was in need of individualized treatment.
The probation officer recommended that respondent be placed on probation and that his parents be placed under an order of protection and be required to participate in any type of therapy ordered for respondent. She based this recommendation upon her conversations with respondent, his parents, neighbors, school officials, respondent’s home bound teacher, the local police, personnel at the secure detention facility, the Department of Social Services, and upon the reports of the psychologist and psychiatrist who examined respondent.
Dr. Lee Rachiele, a psychologist, who did not testify, but who did examine respondent and made a written report which was received into evidence, found respondent to have a full scale I.Q. of 84, which places him in the “dull normal” range. Dr. Rachiele stated in his report that respondent “is in need of psychotherapy and more structuring than is apparently available to him within the home environment. He has the need to develop a wholesome self image, establish a priority system that is generally consistent with that of society, and some realistic goals and directions.” Dr. Rachiele also noted that respondent needed some remedial help in basic academic skills. He said “that *265 relatively long term therapy will be required.” He suggested a residential treatment center. Respondent’s attorney objected to the report because he had no opportunity to cross-examine Dr. Rachiele.
Dr. Jud Staller, the psychiatrist who prepared the psychiatric report (exhibit 3), testified. He was qualified as an expert. He explained the methodology used in preparing his report. In his report Dr. Staller stated that “out patient psychotherapy and family therapy are indicated, to attempt to facilitate an open exploration of the events and feelings of the past year, as well as other areas of concern, such as Dudley’s loner’ status, school difficulties, delayed moral development and possible family enmeshment and denial. Successful therapy will probably be elusive, if he and his parents continue to avoid and deny any problems.” Dr. Staller also stated that: “In light of the seriousness of the crime to which he was found guilty, and in light of the reality that he was in some way involved in the incident, but he and his family are choosing not to deal with it, I believe that Dudley is a potential risk, if left untreated.” He went on to say that “one would be hard pressed to recommend a residential facility as a necessary level of care of ongoing behavioral problems, as he presents none.” He said, at trial, that it was impossible to make a diagnosis of or to predict the future dangerousness of respondent. He said that respondent’s responses to his questions concerning the death of the child could be because he didn’t want to talk to the doctor; could be because he was not involved; or could be because he psychologically couldn’t admit the act. He stated that respondent needed individual psychotherapy and family therapy. He said that psychotherapy should be tried before residential treatment, because respondent needed to deal with his denial of the child’s death and the enmeshment[6] problem. He said that a fixed separation between respondent and his parents could backfire if it occurred before the enmeshment problem was dealt with.
Gail Kirkpatrick of the Department of Social Services, said that respondent had been referred to her for a psychological exam. She chose Dr. Rachiele, who has a contract *266 with the County of Onondaga, to do the psychological exam. She never received a referral for placement.
Regina Hall, a citizen who was displeased with the verdict in the case, also testified. She collected numerous signatures on petitions which stated that Dudley Williams should receive a “maximum sentence of eighteen months imprisonment with no possibility of early parole in a correctional facility and not a juvenile facility.” On cross-examination it was brought out that she had not attended the trial on this matter in County Court, that she was displeased with the jury verdict based upon what she read in the newspaper, and that she .got the signatures by standing outside shopping-centers. An-examination of her petitions shows an absence, of full addresses in many instances and numerous signatures written in the same hand in others.
At the close of all the evidence the parties made closing arguments. The Deputy County Attorney objected to the probation officer’s report. Indeed, he objected to Dr. Rachiele’s report, since he had not had an opportunity to cross-examine the psychiatrist.
The court reserved decision.
Based upon the preponderance of the material and relevant evidence (Family Ct Act, § 745) the court now finds that:
1. respondent is a juvenile delinquent, having been found to be so by the County Court;
2. respondent is in need of treatment;
3. the treatment needed by respondent is intensive psychotherapy and family counseling over a long period of time.
Accordingly, the court places the respondent on probation for two years in accordance with section 757 of the Family Court Act. (Family Ct Act, § 753, subd 1, par [c].) Respondent, pursuant to 22 NYCRR 2507.10 (a), (b), is to:
1. meet with the assigned probation officer when directed to do so by that officer;
2. permit the assigned probation officer to visit the respondent at home;
*267 3. to co-operate in accepting psychiatric diagnosis and treatment and family counseling;
4. to co-operate with the mental health facility to which respondent is referred;
5. to abstain from any act which if done by an adult would be an offense;
6. to abstain from disruptive behavior in the home and in the community;
7. to attend school or special tutoring sessions regularly;
8. to permit the assigned probation officer to obtain information from any person or agency from whom the respondent is receiving or was directed to receive diagnosis, treatment and counseling;
9. to obtain permission from the assigned probation officer for any absence from the county;
10. to engage in service for the public good; also,
11. respondent is prohibited from being a “babysitter” or from acting in any capacity in the care of any child.
Probation is to report to the court on June 30 and December 31 of each year in writing as to whether the terms of the court’s order are being complied with. (22 NYCRR 2507.10 [c].)
Further, in furtherance of the court’s order, the court will make an order of protection, pursuant to section 759 of the Family Court Act. Respondent’s parents are to:
1. participate in family counseling or other professional counseling activities conducted by an authorized person, or an authorized agency to which the child has been referred, deemed necessary for rehabilitation of the child, provided that such family counseling or other counseling activity is not contrary to such person’s religious beliefs (Family Ct Act, § 759, subd [f|); and
2. provide, insofar as they are able, either directly or by means of medical and health insurance, for expenses incurred for medical care and treatment arising from the incidents forming the basis for the issuance of the order (Family Ct Act, § 759, subd [g]);
*268 3. custody of respondent is to remain with his parents. (Family Ct Act, § 759.)

. Criminally negligent homicide is a crime the elements of which are the causing of the death of another person (Penal Law, § 125.10) by a person who fails to perceive a substantial and unjustifiable risk that by its nature and degree “constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.” (Penal Law, § 15.05, subd 4.) Criminally negligent homicide is not a designated felony. (Family Ct Act, § 712, subd [h].)

. These alternatives are not available to the court in this case. Criminally negligent homicide is not a designated felony. (Family Ct Act, § 712, subd [h].) A respondent can only be placed with the Department of Mental Health if the respondent is diagnosed as being mentally ill, suffering from mental retardation or a developmental disability as those conditions are defined in section 1.03 of the Mental Hygiene Law.

. As noted by Professor Merril Sobie: “Prior to the nineteenth century, criminal punishment was swift and physical in nature; imprisonment was unknown.” (The Juvenile Offender Act, A Study of the Act’s Effectiveness and Impact on the New York Juvenile Justice System, p 7.)

. The witnesses in this matter were: Barbara Ahern, probation officer; Dr. Jud Staller, a psychiatrist; Gail Kirkpatrick, Department of Social Services; and Regina Hall, a citizen. The exhibits introduced were: exhibit 1: probation report of February 23, 1982; exhibit 2: report of DrrLee D. Rachiele, psychologist; exhibit 3: report of Dr. Jud Staller, psychiatrist; exhibit 4: petition signed by concerned citizens.

. An order of removal was filed with this court on January 3, 1983. The order concerned indictment No. 82-230-1, indexed in the County Court of Onondaga County (No. 82/409). The order vacated a verdict of criminally negligent homicide, because the defendant (respondent herein) was not criminally responsible for his act by reason of infancy. The verdict was placed with a finding of juvenile delinquency, and the matter was removed to this court.
The matter first appeared in this court on January 3, 1983. Present were respondent, his mother and father, his attorney, and a County Attorney. The court ordered that the Probation Department prepare a social investigation. The matter was adjourned to February 3 for a hearing. At the request of the probation officer, the court ordered a psychiatric examination of respondent pursuant to section 251 of the Family Court Act. On February 24, 1983 the matter was adjourned at the request of respondent. On February 28 the matter was again adjourned. On March 3,1983 the hearing commenced. All parties were present and represented by counsel. Respondent’s parents were also present. The court heard the evidence, received the exhibits and the evidence was closed. The court reserved decision. Subsequent correspondence received concerning the disposition of the case was put in a sealed envelope in the court’s file unread by the court.

. Enmeshment is a term of art which indicates that respondent and his family are too close to and protective of one another.