JUSTICE TRIEWEILER
dissenting in part and concurring in part.
I dissent from that part of the majority opinion which concludes that defendants’ publication of the November 30, 1988, article was privileged as a matter of law. I conclude that there was no constitutional privilege which applied to this case and that whether there was a statutory privilege was an issue of fact which could not be resolved by summary judgment.
The United States Supreme Court’s decision in Landmark Communications, Inc. v. Virginia (1978), 435 U.S. 829, 98 S.Ct. 1535, 56 L. Ed. 2d 1, which is relied upon by the majority was a narrow decision limited to the facts before the Court in that case. Those facts bear no similarity to the facts alleged in this case.
In Landmark, 435 U.S. at 837, 98 S.Ct. at 1540, the issue before the Supreme Court was stated as follows:
The narrow and limited question presented, then, is whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission.
The differences in Landmark are readily apparent. First, and most importantly, that decision involved a judicial officer. This case involves a private citizen. Second, that case involved admittedly truthful information, while the plaintiff in this case alleged that the *448 material published by defendants was untruthful. Finally, the issue in Landmark was whether the publisher of truthful information can be punished, while the issue in this case is whether the victim of untruthful information can be compensated.
In arriving at its conclusion that a constitutional privilege protected the defendant, the Supreme Court relied heavily on its rationale that “[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern ." Landmark, 435 U.S. at 839, 98 S.Ct. at 1541.
There is no similar public concern in this case.
Neither did Smith v. Daily Mail Publishing Company (1979), 443 U.S. 97, 99 S. Ct. 2667, 61 L. Ed. 2d 399, nor Florida Star v. B.J.F. (1989), 491 U.S. 524, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (cases also relied upon by the majority), involve facts or issues similar to those in this case. Both cases again involved the limited issue of whether a state could criminally punish the publication of truthful information. In fact, in Smith, 443 U.S. at 105-06, 99 S.Ct. at 2671-72, the Court held that:
Our holding in this case is narrow ... there is no issue here of privacy .... At issue is simply the power of a state to punish the truthful publication of an alleged juvenile delinquent’s name lawfully obtained by a newspaper. The asserted state interest cannot justify the statute’s imposition of criminal sanctions on this type of publication.
In Philadelphia Newspapers, Inc. v. Hepps (1986), 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783, 793, the Supreme Court simply held that when the subject of a newspaper article involved matters of government it was of sufficient public interest that the plaintiff would be required to prove the falsity of the publication before he could recover damages for defamation.
However, in this case, the plaintiff was neither a public official nor a public figure and the accusations made against him involved a simple dispute between an attorney and his client. There was no significant public interest in the subject of defendants’ newspaper article. According to the U.S. Supreme Court’s decisions, this type of communication possesses no significant constitutional privilege. Gertz v. Robert Welch, Inc. (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789; Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc. (1985), 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593. In Hepps, the Supreme Court summarized First Amendment protection for newspapers in the following fashion:
*449 One can discern in these decisions two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, as in Gertz, the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, as in Dun & Bradstreet, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape. [Emphasis added.]
Hepps, 475 U.S. at 775, 106 S.Ct. at 1563.
The majority concludes under Issue II that pursuant to the Hepps decision, Lence must prove that the Daily Inter Lake article was untrue; and that since the inaccuracies in the article were inconsequential, he has not met that burden. It is true that he must prove the article’s falsity. However, that is not because of Hepps. It is because, by statute, falsity is a required element of a libel action in Montana. Section 27-1-802, MCA.
When the majority concludes that the article is substantially true, it misconstrues the nature of Lence’s complaint. His complaint is that the November 30, 1988, article in the Daily Inter Lake repeated Semenza’s defamatory allegations that Lence committed fraud and professional misconduct, refused to pay Semenza for work that had been done, and unlawfully retained Semenza’s files. Lence contends that these allegations were untrue, and in support of that contention, he offers the fact that the complaint against him before the Commission on Practice was subsequently dismissed.
A newspaper cannot avoid liability by honestly pointing out that it is simply repeating statements made by others. “[0]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.” Restatement (Second) of Torts, § 578 (1977).
Therefore, while I concur with the majority that the 1989 articles regarding building code violations were substantially true, I disagree *450 that the accusations contained in the 1988 article were substantially true, and I disagree that the authorities relied upon by the majority under Issue II of that opinion grant any privilege to the Daily Inter Lake for the November 30, 1988, article that it published.
If there is any privilege for the November 30, 1988, article, it is based upon § 27-1-804(4), MCA. That section provides that:
A privileged publication is one made:
(4) by a fair and true report without malice of a judicial, legislative, or other public official proceeding or of anything said in the course thereof. [Emphasis added.]
I agree that the Daily Inter Lake’s reference to the Supreme Court had no significance to anyone other than attorneys, and that attorneys who read the entire article would not be mislead by that reference. Therefore, the November 30, 1988, article was “a fair and true report of a judicial proceeding.” However, § 27-1-804(4), MCA, also requires that the publication be without malice. Since the privilege is statutorily created, we must look to the statutory definition of malice in Montana’s Code. The only one I am aware of is the one found at § 27-1-221, MCA, which defines malice as follows:
(2) A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
(a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
(b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.
Whenever the meaning of a word or phrase is defined in any part of the Montana Code Annotated, that definition is applicable to the same word or phrase when it appears elsewhere. Section 1-2-107, MCA.
I conclude, based upon the testimony of Jacqueline Adams, the author of the article about which Lence complains, that there was a factual issue regarding whether Adams was aware of facts which suggested a high probability of damage to Lence, and then acted with indifference to that high probability.
Adams testified that she first met Semenza during the month in which the article was published. She knew that he had been previously accused of flooding Lence’s office and causing substantial damage. She knew, based upon that accusation and her interview with Semenza, that he had a high degree of animosity toward Lence. *451 She had no prior experience with Semenza which would indicate that he was a reliable source of information. She was obviously aware of the fact that the allegations contained in the article would be very damaging to Lence’s professional reputation. However, she testified that she did not give any great thought to that potential damage before publishing the article.
Instead of attempting to verify the allegations made by Semenza, she published them without any further investigation. Even though she was aware that Semenza had made his complaint about the theft of his files to the Kalispell Police Department, and even though she was aware of the officer to whom the complaint was made, she made no effort to confirm the truthfulness of that accusation. She made no effort to contact Lence regarding Semenza’s accusations; and made no other effort to independently verify anything she had been told by Semenza. She stated that it was not her job to determine who was calling who names and who was right.
Even after Semenza’s complaint to the Commission on Practice was dismissed, there was no follow-up publication in the Daily Inter Lake which pointed that out.
There is a school of constitutional thought to which the majority apparently subscribes which holds that there is some public benefit from encouraging this kind of reckless disregard for the professional and personal reputation of others. However, I disagree. We are not, in this case, talking about prior restraint of speech or press. We are considering the similarly important rights of people who are damaged by the irresponsible exercise of First Amendment rights.
So long as reporters are given the broad immunity provided for in the majority opinion, they, like Adams, will continue to have no reason for caring about the truthfulness of the harmful allegations that they report. While this free-wheeling approach may serve the interest of free exchange of information, it certainly ignores an equally compelling interest that all private individuals have in preserving their reputation. As pointed out in Gertz, 418 U.S. at 341, 94 S.Ct at 3008:
The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as MR. JUSTICE STEWART has reminded us, the individual’s right to the protection of his own good name
*452 “reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.” Rosenblatt v. Baer, 383 U.S. 75, 92, 86 S.Ct 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion.)
I concur with the majority’s disposition of Issues IV, V, and VI, but do not agree with all the reasons given for the majority’s disposition of those claims. I would affirm the District Court’s dismissal of those claims because they are, in substance, simply reallegations of plaintiff’s claim for defamation. The elements necessary for each of those claims are essentially the same as the elements necessary to prove the plaintiff’s defamation claim. Furthermore, I conclude that the facts alleged by the plaintiff do not satisfy the quantum or quality of proof necessary to establish a claim for intentional infliction of emotional distress and are not the type of facts for which we have previously recognized a claim for negligent infliction of emotional distress.
I also concur with the majority’s disposition of Lence’s claim for defamation based on the 1989 articles in the Daily Inter Lake. I would, however, reverse the District Court’s judgment which dismissed Lence’s claim based upon the November 30,1988, article and remand that claim to the District Court for trial of the factual issue raised and discussed above. If, after consideration of the facts presented, a jury determined that Adams’ article was not published with malice as defined in our statutes, then I would conclude it was privileged. On the other hand, if a jury found that her conduct was malicious, I would conclude that Lence’s claim for defamation is actionable.
JUSTICE HUNT joins in the foregoing dissent and concurrence.