502 A.2d 1310

**Alfred R. BOETTGER**

v.

**Thom LOVERRO and Easton Publishing Company.**

**Appeal of EASTON PUBLISHING COMPANY.**

**Alfred R. BOETTGER, Appellant,**

v.

**Thom LOVERRO and Easton Publishing Company.**

Superior Court of Pennsylvania.

Argued March 13, 1985.

Filed Jan. 3, 1986.

April L. Cordts, Easton, for appellant in No. 984 and for appellee in No. 1035.

Before SPAETH, President Judge, and JOHNSON AND SHOYER *, JJ.

* The Honorable Kendall H. SHOYER, Senior Judge of the Court of Common Pleas of Philadelphia County, is sitting by designation.

SPAETH, President Judge:

This appeal is from a judgment awarding damages to appellee under Section 5725 of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. §§ 5701 *et seq.*[1] Appellant, a newspaper, published an article containing quotations from the transcript of appellee's wiretapped conversations. The transcript was attached to the Commonwealth's answer to a motion for discovery, filed incident to the prosecution of appellee, and was given to one of appellant's reporters by the clerk of the court. In addition to statutory and constitutional arguments, appellant argues that it is exempt from liability for publishing information of legitimate public concern obtained from court records accessible to the public. We agree that when enacting section 5725, the General Assembly intended such an exemption. We therefore reverse and enter judgment for appellant.

## I

The trial court has summarized the facts, which it noted were largely undisputed, as follows:

---

1.  Section 5725 of the Act provides:

    **§ 5725. Civil action for unlawful interception, disclosure or use of wire or oral communication**

    (a) **Cause of action.**—Any person whose wire or oral communications is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:

    (1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.

    (2) Punitive damages.

    (3) A reasonable attorneys' fee and other litigation costs reasonably incurred.

    (b) **Waiver of sovereign immunity.**—To the extent that the Commonwealth and any of its officers, officials or employees would be shielded from liability under this section by the doctrine of sovereign immunity, such immunity is hereby waived for the purposes of this section.

    (c) **Defense.**—It is a defense to an action brought pursuant to subsection (a) that the actor acted in good faith reliance on a court order or the provisions of this chapter.

On November 17, 1981, the state police secured a wiretap permit from the Attorney General. Under the permit, a private citizen named Wayne Dickinson consented to a phone tap. On November 19, 1981, the state police intercepted a telephone conversation between the plaintiff [appellee] and Dickinson. During the conversation, plaintiff revealed his involvement in the acceptance of illegal bets on college football games. On December 12, 1981, the state police raided plaintiff's home. After the search, he was arrested on charges of bookmaking, pool selling and conspiracy. A preliminary hearing resulted in the charges being bound over for criminal court. On February 9, 1982, a motion for discovery was filed in the criminal case. The motion included a request for production of a transcript of the wiretap. Inadvertently,[] the district attorney attached a copy of the transcript to his answer and filed it with the clerk of court. To make matters even worse, the district attorney did not direct the clerk to impound the file.

With these highly sensitive records lying outside the court's direct supervision, the stage was set for the unusual happenings which subsequently took place. On March 31, 1982, a suppression hearing was held in the criminal case. The hearing was open to the public. Among the observers was Thom Loverro, a reporter for the Easton Express.[3] He covered the hearing because he expected that the evidence would disclose the contents of the wiretaps. But, he did not get his story in the courtroom. As he sat there, the hearing judge disposed of the motion to suppress without ever getting into the contents of the tapes. When the hearing ended, Loverro went to the office of the clerk of court; and, he asked to see the case file.[4] Not being subject to impoundment, it was made available to him. In the file, Loverro discovered a transcript of the wiretaps. He made extensive notes of its content. Later that same day, he returned to his office and began writing a story based upon the excerpts taken from the transcript of the wiretaps. However, the story was withheld for approximately seven days. In the

meantime, Loverro discussed the running of the story with his superiors.  On April 7, 1982, the managing editor approved publication.  The newspaper article contained quotations from the transcript of the wiretaps.

---

**3.** A newspaper of daily circulation published by the defendant [appellant].

**4.** The evidence does not establish whether or not Loverro knew that the transcript could be found there.

Slip op. of tr. ct. at 2–3.

Appellee's complaint, which was filed on April 13, 1982, named as defendants both appellant, as the publisher of the Easton Express, and its reporter, Loverro.  Appellee sought to recover on two grounds: the common law tort of invasion of privacy, and the cause of action for unlawful disclosure or use created by section 5725.  During the trial, in September 1983, Loverro was dropped as a defendant, N.T. 130–31, and the action for invasion of privacy was withdrawn, *id.*, 91.  The trial court denied appellant's requested points for charge and directed a verdict in favor of appellee on the issue of liability for unlawful disclosure or use, appellant excepting to the direction.  The jury then returned a verdict of $1,000 actual damages (the statutory minimum), no punitive damages, and $17,409.43 for attorney's fees.  Appellant filed a timely motion for judgment n.o.v. or new trial.  On March 6, 1984, the court en banc, composed of the trial judge alone, denied the motion.  Judgment was entered and this appeal followed.

## II

■ We may first consider appellant's argument that when read literally, section 5725 does not make unlawful appellant's publication of a newspaper article containing quotations from the transcript of appellee's wiretapped conversations.  The argument may be disposed of summarily.

Section 5725 creates a cause of action against "any person who intercepts, discloses or uses" the communication of another person when that communication has been "dis-

closed ... in violation of this chapter." 18 Pa.C.S. § 5725(a). The disclosure by the clerk of court of the transcript of appellee's wiretapped conversations was in violation of the Act, for the transcript was required by the Act to be sealed, 18 Pa.C.S. § 5715, and had it been sealed, appellant would have had no right to see it, *Commonwealth v. Frattarola*, 336 Pa.Super. 411, 485 A.2d 1147 (1984). In publishing the newspaper article containing quotations from the transcript, appellant both "disclose[d]" and "use[d]" appellee's intercepted communication.

Appellant argues that it acted "with a subjective good faith belief that they [appellant and its reporter] acted legally pursuant to a court order and that the belief was reasonable." Brief for Appellant at 24. Subsection (c) of section 5725 does provide that "good faith reliance on a court order" is a defense to an action for unlawful disclosure or use. Had there been a court order directing the clerk to unseal the transcript of appellee's wiretapped conversations, this defense might have been available to appellant, but there was no such order.

### III

We may consider appellant's remaining two arguments together. These arguments are: that appellant is exempt from liability under section 5725 because the information it published was of legitimate public concern and was obtained from court records accessible to the public; and that if section 5725 does seek to impose liability on appellant, it is unconstitutional as a violation of the freedom of the press protected by the First and Fourteenth Amendments of the United States Constitution.

Appellant has from the outset, in its answer, and throughout, in its motion for summary judgment, requested points for charge, and motion for judgment n.o.v., argued that it is exempt from liability under section 5725. In making this argument, appellant has cited the Fair Report Privilege recognized in the Restatement (Second) of Torts

§ 611 (1976).[2] Appellant has not, however, presented its constitutional argument with equal consistency; although making the argument in its motion for judgment n.o.v., appellant did not make it in either its pleadings or its requested points for charge. Accordingly, as such, the constitutional argument has not been preserved. The argument is nevertheless before us indirectly, or, so to speak, by the back door.

As we have just discussed, literally read, section 5725 proscribes appellant's conduct. The question therefore arises whether the section *should* be literally read, or whether appellant is correct that we should read into the section an exemption recognizing a privilege to publish information that is of legitimate public concern and that was obtained from court records accessible to the public. In considering whether to find such an exemption implied in section 5725, we must ask whether the failure to find the exemption implied might render the section unconstitutional. For it is a settled principle of statutory construction that the legislature does not intend to violate the Constitution, and if as applied to appellant, section 5725 when literally read would violate the Constitution, we must consider whether an alternative construction, such as finding an implied exemption, will save the section. *Triumph Hosiery Mills, Inc. v. Commonwealth*, 469 Pa. 92, 96, 364 A.2d 919, 921 (1976) ("[O]ur duty [is] 'to declare a statute constitutional if this can reasonably be done,' " *citing Commonwealth v. Girard Life Insurance Co.*, 305 Pa. 558, 566, 158 A. 262, 264 (1932)), *appeal dismissed*, 429 U.S. 1083, 97 S.Ct. 1090, 51 L.Ed.2d 530 (1977); *Commonwealth v. Rum-*

2. The Fair Report Privilege applies to defamatory matter:
   Report of Official Proceeding or Public Meeting
   The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.
   Restatement (Second) of Torts § 611 (1976).
   *See Curran v. Philadelphia Newspapers, Inc.*, 497 Pa. 163, 439 A.2d 652 (1981) (adopting section 611).

*sey*, 309 Pa.Super. 137, 139, 454 A.2d 1121, 1122 (1983) ("Legislative enactments are presumed valid, and will be stricken only if incapable of constitutional construction."); *Commonwealth v. Morgan*, 265 Pa.Super. 225, 248, 401 A.2d 1182, 1193 (1979) ("[W]here alternative constructions of a statute are possible, we must avoid a construction that would result in a statute's being struck down unnecessarily.").

## A

In considering whether if literally read, section 5725 would violate the Constitution, we may start by recognizing that "[the United States Supreme Court's] recent decisions demonstrate that state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 102, 99 S.Ct. 2667, 2670, 61 L.Ed.2d 399 (1979). Of these recent decisions, *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), is particularly in point.

In *Cox* the issue was "whether, consistently with the First and Fourteenth Amendments, a State may extend a cause of action for damages for invasion of privacy caused by the publication of the name of a deceased rape victim which was publicly revealed in connection with the prosecution of the crime." *Id.* at 471, 95 S.Ct. at 1034. A Georgia statute made it a misdemeanor for the news media to publish or broadcast the name or identity of a rape victim.[3] *Id.* at 471–72, 95 S.Ct. at 1034. In the course of criminal

---

3. The Georgia statute provided:
   It shall be unlawful for any news media or any other person to print and publish, broadcast, televise, or disseminate through any other medium of public dissemination or cause to be printed and published, broadcast, televised, or disseminated in any newspaper, magazine, periodical or other publication published in this State or through any radio or television broadcast originating in the State the name or identity of any female who may have been raped or upon whom an assault with intent to commit rape may have been made. Any person or corporation violating the provisions of this section shall, upon conviction, be punished as for a misdemeanor.
   Ga.Code Ann. § 26–9901 (1972).

proceedings related to the rape, a reporter for Cox Broadcasting "approached the clerk of the court ... and requested to see a copy of the indictments. In open court, [the reporter] was handed ... both the murder and the rape indictments, and was allowed to examine fully [those] document[s]." *Id.* at 472, n. 3, 95 S.Ct. at 1034, n. 3. By examining the indictments the reporter learned the name of the rape victim, and he revealed the name in a news report concerning the criminal proceedings, broadcast later the same day and again the next day on a television station owned by Cox Broadcasting. *Id.* at 472–74, 95 S.Ct. at 1034–36. The father of the rape victim brought an action for money damages alleging that his right to privacy had been invaded by the broadcast of his deceased daughter's name. The trial court rejected Cox Broadcasting's claim under the First and Fourteenth Amendments, and, holding that the Georgia statute granted the father a civil remedy, granted summary judgment as to liability. *Id.* at 474, 95 S.Ct. at 1035–36. On appeal the Georgia Supreme Court found that the trial court erred in finding that the Georgia statute granted the father a civil remedy but nevertheless found that the father had adequately stated a cause of action for invasion of his right of privacy, and for a common law tort of public disclosure. *Id.* Noting that questions of fact remained to be determined, the Georgia Supreme Court reversed the order entering summary judgment and remanded for trial. *Id.* at 475, 95 S.Ct. at 1036. The Georgia Supreme Court agreed with the trial court's holding that the First and Fourteenth Amendments did not require judgment for Cox Broadcasting as a matter of law, *id.*, but later, in response to a motion for rehearing, held that the Georgia statute was a "legitimate limitation on the right of freedom of expression contained in the First Amendment," and that there was "no public interest or general concern about the identity of the victim of such a crime as will make the right to disclose the identity of the victim rise to the level of First Amendment protection." *Id.*

On Cox Broadcasting's further appeal, the United States Supreme Court opened its discussion by acknowledging that "there *is* a zone of privacy surrounding every individual, a zone within which the State may protect him from intrusion by the press, with all its attendant publicity." *Id.* at 487, 95 S.Ct. at 1042. (Court's emphasis; footnote omitted). The Court noted, however, that the issue before it was not the broad issue of the extent to which a State may "protect an area of privacy free from unwanted publicity in the press", *id.* at 491, 95 S.Ct. at 1044, but the much narrower issue of "whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection," *id.* "We are convinced," the Court concluded, "that the State may not do so." *Id.* The Court explained:

Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection. *Id.* at 495, 95 S.Ct. at 1046.

*See also Smith v. Daily Mail Publishing Co., supra* (State may not punish truthful publication of alleged juvenile delinquent's name where the information was lawfully obtained); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (reaffirming *Cox* and holding that State may not impose criminal sanctions on press for publishing, in violation of State Constitution and statutes, information relating to judicial discipli-

nary proceedings); *Oklahoma Publishing Co. v. District Court of Oklahoma*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977) (where reporters acquired information by being present at court proceedings, the name and picture of juvenile were "publicly revealed" and in the "public domain" as much as the name of the rape victim in *Cox*, and therefore injunction prohibiting publication of the information violated the First and Fourteenth Amendments).

In the present case, the information published by appellant was part of court records accessible to the public, as was true in *Cox*. In addition, the information was required to be sealed or otherwise treated as confidential, as was true in *Landmark Communications*. In *Cox*, *Landmark Communications*, and *Smith*, the defendant newspaper obtained the information in question in a lawful manner and reported it accurately. Appellant likewise obtained the information lawfully and reported it accurately. So far, therefore, the present case appears indistinguishable from *Cox*, *Landmark Communications*, and *Smith*.

The question remains whether the cases are distinguishable on the basis of the type of information involved—the name of the deceased rape victim in *Cox*, the name of the judge being investigated in *Landmark Communications*, the name of the juvenile offender in *Smith*, and the transcripts of appellee's conversations here. We conclude that this is not a basis of distinction. The information here, like the information in *Smith*, was "about a matter of public significance," *Smith*, 443 U.S. at 103, 99 S.Ct. at 2671; and like the information in *Cox*, it involved "commission of crime, prosecution[] resulting from it, and judicial proceedings arising from the prosecution[], ... without question events of legitimate concern to the public," *Cox*, 420 U.S. at 492, 95 S.Ct. at 1045. *Cf. Baker v. Burlington Northern, Inc.*, 99 Idaho 688, 587 P.2d 829 (1978) (disclosure of public facts, plaintiff's prior criminal record, not actionable as invasion of privacy); *State v. Stauffer Communications, Inc.*, 225 Kan. 540, 592 P.2d 891 (1979) (state cannot impose sanctions on news media for publishing information con-

cerning unexecuted arrest warrant where such information taken from public records); *Rawlins v. Hutchinson Publishing Co.,* 218 Kan. 295, 543 P.2d 988 (1975) (*Cox* applied to record ten years old); *Montesano v. Donrey Media Group,* 99 Nev. 644, 668 P.2d 1081 (1983) (where information of juvenile offense obtained from public records, the probation and parole report prepared for sentencing for subsequent crime, media not liable for invasion of privacy), *cert. denied,* 466 U.S. 959, 104 S.Ct. 2172, 80 L.Ed.2d 555 (1984); *Shifflet v. Thomson Newspapers (Ohio), Inc.,* 69 Ohio St.2d 179, 431 N.E.2d 1014 (1982) (per curiam) (where reporter at expungement hearing and information reported truthfully, First and Fourteenth Amendments do not permit exposing press to liability; citing *Landmark Communications, Oklahoma Publishing,* and *Cox* ); *Ayers v. Lee Enterprises, Inc.,* 277 Or. 527, 561 P.2d 998 (1977) (police report was public record and, following *Cox,* no liability for publishing name and address of rape victim); *Philadelphia Newspapers, Inc. v. Jerome,* 478 Pa. 484, 387 A.2d 425 (1978) (in upholding trial court's order limiting public access to suppression hearing, appellate court, citing *Oklahoma Publishing,* notes that trial court had no authority to "gag[] the press"), *appeal dismissed,* 443 U.S. 913, 99 S.Ct. 3104, 61 L.Ed.2d 877 (1979); *Mark v. Seattle Times,* 96 Wash.2d 473, 635 P.2d 1081 (1981) (en banc) (information from affidavit of probable cause included in record privileged under *Cox* ), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2942, 73 L.Ed.2d 1339 (1982).

## B

■ Given *Cox, Landmark Communications,* and *Smith,* we are constrained to conclude that the legislature did not intend that section 5725 should be construed to impose liability on appellant for its publication of information of legitimate public concern lawfully obtained from court records accessible to the public. For if we were to give the section such a construction, its application to appellant would violate the First and Fourteenth Amend-

ments. We therefore hold that included in the section is an implied exemption for the publication of lawfully obtained information of legitimate public concern. So construed, application of the section to appellant presents no constitutional issue. *Cf. Commonwealth v. Morgan, supra* (to preserve constitutionality of statute, phrase, "not manifestly appropriate to lawful uses it [instrument of crime] may have," construed to mean "manifestly inappropriate to lawful uses it may have").

We are confirmed in this conclusion by the application of one further principle of statutory construction. When the legislature enacts a statute after an interpretation of the law by a court of last resort, it will be assumed that the legislature intended the statute to incorporate that interpretation. 1 Pa.C.S. § 1922(3). Here, the General Assembly enacted section 5725 as part of the Act of October 4, 1978, P.L. 831, No. 164, § 2, after the United States Supreme Court's decisions in *Cox, Landmark Communications,* and *Oklahoma Publishing.*[4] We may assume, therefore, that in enacting section 5725, the General Assembly did not intend to deprive appellant of the constitutional right of publication upheld in those decisions. Since the General Assembly did not specifically exempt such publication, it is reasonable to imply an exemption.[5]

Judgment reversed and judgment entered for appellant.

JOHNSON, J., files a concurring opinion.

JOHNSON, Judge, concurring:

I write separately because I do not believe that the manner in which the information was obtained from the clerk of court's office was within the legislature's contemplation when promulgating the Act. Once the transcripts were made a part of the unsealed case file, they became, for

---

4. Compare prior provisions: Act of July 16, 1957, P.L. 956, No. 411, § 1, 18 P.S. § 2443 [renumbered 18 P.S. § 3742], repealed Act of Dec. 6, 1972, P.L. 1482, No. 334, § 5; Act of Dec. 6, 1972, P.L. 1482, No. 334, § 1, 18 Pa.C.S. § 5704.

5. Given this disposition, we do not address appellee's argument that he is entitled to punitive damages.

all intents and purposes, matters of public record. Appellant could not then willfully disclose or use the information in a manner which violated the law because, in my view, that information was no longer shrouded in the secrecy provided by the Wiretap Act. Any private citizen could have viewed the wiretap transcripts in the clerk of court's office and would be no more or less subject to criminal or civil liability than appellant herein.

The principles of statutory construction analyzed by my esteemed brother are unquestionably valid, but I see no need to evaluate a possible constitutional conflict in this case to determine the intent of the legislature. Moreover, I do not believe that a constitutional question is before us, indirectly or otherwise, because, as stated by the majority, it was not properly preserved. The majority's erudite discussion in Part III–A is, therefore, unnecessary to our disposition of this case.

I concur in the result reached by the majority in Part III–B that an implied exemption for the publication of lawfully obtained information of legitimate public concern is included in section 5725. In my mind, the discussion begins and ends here. I would, therefore, reverse the judgment simply on the basis that the trial court, as a matter of law, should not have found a statutory violation where none had occurred.