587 A.2d 712

**Alfred R. BOETTGER, Appellant,**

v.

**Thom LOVERRO and Easton Publishing Company,**

**Ernest D. Preate, Jr., Attorney General, Intervenor.**

Supreme Court of Pennsylvania.

Reargued April 2, 1990.

Decided March 14, 1991.

Dissenting Opinion March 26, 1991.

E. Jerome Brose, for appellant.

Ronald W. Shipman, Easton, for Thom Loverro.

April L. Cordts, Easton, for Easton Pub. Co.

Ernest D. Preate, Jr., Atty. Gen., Robert A. Graci, Chief, Deputy Atty. Gen., Anthony Sarcione, Executive Deputy Atty. Gen., for Intervenor.

Samuel E. Klein, Katherine Hatton, Laura E. Little, Philadelphia, for Amicus—Philadelphia Inquirer, Philadelphia Daily News, et al.

Michele Langer, Teresa A. Wallace, Philadelphia, for Amicus—American Newspaper Publishers Assoc., et al.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

NIX, Chief Justice.

Judgment in this case, *Boettger v. Loverro*, 521 Pa. 366, 555 A.2d 1234 (1989, reargument denied May 18, 1989) ("Boettger I") has been vacated and remanded by the United States Supreme Court for further consideration in light of *The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) ("Florida Star"). After review and a constitutionally permissible construction of the statute involved, we affirm, on different grounds, the judgment of the Superior Court. 349 Pa.Super. 134, 502 A.2d 1310.

## I.

On November 17, 1981, the Pennsylvania State Police obtained a wiretap permit from the Attorney General pursuant to section 5704(2)(ii) [1] of the Wiretapping and Electronic

---

1. **§ 5704. Exceptions to prohibition on interception and disclosure of communications**
It shall not be unlawful under this chapter for:

\* \* \* \* \* \*

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire or oral communication involving suspected criminal activities where:

\* \* \* \* \* \*

(ii) one of the parties to the communication has given prior consent to such interception. However, no interception under this

Surveillance Control Act ("the Act"), 18 Pa.C.S. § 5701, *et seq.*[2] Shortly thereafter, the State Police intercepted a telephone conversation between the appellant and a consenting individual, Wayne Dickerson. The intercepted conversation revealed appellant's involvement in illegal gambling activities on college football games. The appellant was subsequently charged with bookmaking, pool selling and conspiracy. After being held over for trial on the charges, appellant requested discovery by letter under Pa. R.Crim.P. 305, and subsequently filed a motion to compel discovery, together with an order and a rule to show cause upon the District Attorney, demanding he produce a transcript of the intercepted call. The District Attorney's office complied and attached a copy of the transcript to the response filed with the Clerk of Courts, Criminal Division.[3] Thereafter, appellant filed a Motion to Suppress. Section 5721 of the Act[4] authorizes motions to suppress.

> paragraph shall be made unless the Attorney General or a deputy attorney general designated in writing by the Attorney General, ... has reviewed the facts and is satisfied that the consent is voluntary and has given prior approval for the interception; however such interception shall be subject to the recording and record keeping requirements of section 5714(a) (relating to recording of intercepted communications) and that the Attorney General, deputy attorney general, district attorney or assistant district attorney authorizing the interception shall be the custodian of recorded evidence obtained therefrom.

2. The entire electronic surveillance act was amended on October 21, 1988, after this lawsuit was instituted. However, because the changes effected by the Amendment do not bear upon the merits of the instant appeal, the sections herein are cited as they appeared in 1982, at the time of trial.

3. The lower courts and the majority of this Court in *Boettger v. Loverro,* 521 Pa. 366, 555 A.2d 1234 (1989), (*"Boettger I"*), characterized the action of the District Attorney's office as inadvertence. "Inadvertently, but in violation of the disclosure section of the Act, 18 Pa.C.S. § 5717(b), the District Attorney attached a copy of the transcript to his answer and filed it with the clerk of courts." 521 Pa. at 369, 555 A.2d at 1236.

4. That section provides, in pertinent part:
§ 5721. **Suppression of contents of intercepted communication or derivative evidence**
(a) **Motion to suppress.**—Any aggrieved person in any trial, hearing, or other adversary proceeding in or before any court or other authority of this Commonwealth may move to suppress the contents

On March 31, 1982, a hearing was held on the suppression motion. A reporter (Loverro) for Easton Express, a newspaper owned by appellee Easton Publishing Company ("Easton"), attended the suppression hearing. After the hearing the reporter went to the Office of the Clerk of Court, Criminal Division, and asked to see the court file of the case. The file contained the transcript of the wiretaps and no restrictions as to access or disclosure; it was given to Loverro. He read the file and made extensive notes, then wrote a news story based upon, *inter alia,* his notes including certain quotes from the transcript.

Publication was withheld awaiting the issuance of the court order which, dated March 31, 1982, denied the Motion to Suppress. On April 7, 1982, the managing editor approved publication; the article, including excerpts from the wiretap transcripts, was published. Subsequently appellant Boettger pled *nolo contendere* to the charges, was convicted and sentenced to a fine.

On April 13, 1982, Boettger filed a civil action against Loverro and Easton on two grounds: common law tort for

of any intercepted wire or oral communication, or evidence derived therefrom, on any of the following grounds:

(1) The communication was unlawfully intercepted.

(2) The order of authorization if required is insufficient on its face.

(3) The interception unless made in accordance with section 5704 (relating to exceptions to prohibition on interception and disclosure of communications) was not made in conformity with the order of authorization or in accordance with the requirements of section 5712 (relating to issuance of order and effect).

**(b) Procedure.**—The motion shall be made at least ten days before the trial, hearing, or other adversary proceeding unless there was no opportunity to make the motion or the moving party was not aware of the grounds for the motion. Motions by co-indictees are to be heard in a single consolidated hearing. The court, upon the filing of such motion by the aggrieved person, shall make available to the aggrieved person or his counsel the intercepted communication and evidence derived therefrom. If the motion is granted, the entire contents of all intercepted wire or oral communications obtained during or after any interception which is determined to be in violation of this chapter under subsection (a) or evidence derived therefrom, shall not be received in evidence in the trial, hearing or other adversary proceeding.

invasion of privacy and the civil action created by section 5725 of the Act.[5] It was alleged that the publication was in violation of the provisions of section 5703.[6] During the proceedings of September, 1983, the common law tort action was withdrawn and Loverro dropped as a defendant. The trial court directed a verdict as to liability for Boettger pursuant to section 5725(a) based upon its ruling that Easton's disclosure was unauthorized by the statute. The jury returned a verdict of $1,000.00 "actual" damages (the statutory minimum), no punitive damages and $17,409.43 attorney's fees and costs. Motions for judgment *non obstante*

5.  § 5725. Civil action for unlawful interception, disclosure or use of wire, electronic or oral communication

    (a) **Cause of Action.**—Any person whose wire or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:

    (1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.

    (2) Punitive damages.

    (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

    (b) **Waiver of sovereign immunity.**—To the extent that the Commonwealth and any of its officers, officials or employees would be shielded from liability under this section by the doctrine of sovereign immunity, such immunity is hereby waived for the purposes of this section.

    (c) **Defense.**—It is a defense to an action brought pursuant to subsection (a) that the actor acted in good faith reliance on a court order or the provisions of this chapter.

6.  § 5703. Interception, disclosure or use of wire or oral communications

    Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:

    *       *       *       *       *       *

    (2) willfully discloses or endeavors to disclose to any other person the contents of any wire or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication; or

    (3) willfully uses or endeavors to use the contents of any wire or oral communications, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire or oral communication.

*veredicto* and for a new trial were denied by the trial judge sitting as the court *en banc* on March 6, 1984.

On appeal to the Superior Court, the judgment of the trial court was reversed and judgment entered for Easton by a three-judge panel, one judge concurring.

Boettger's allowance of appeal was granted and this Court in *Boettger I* reversed the Superior Court. Petition for Certiorari was filed by Easton in the United States Supreme Court where, as previously stated, our judgment was vacated and the matter remanded for further consideration in light of *Florida Star*. In that case a newspaper, The Florida Star, published in its "Police Reports" section a brief account of a robbery and sexual assault. The account included the name of the victim. The news story was based upon a police report (copied verbatim by a reporter-trainee) which had been placed in the press room of the Sheriff's Department. Access to the press room and reports made available therein were not restricted. A Florida statute makes it a misdemeanor of the second degree to "print, publish or broadcast ... in any instrument of mass communication" the name of the victim of any sexual offense.[7] The newspaper had an internal policy against publishing the names of sexual offense victims.

The victim, identified only as B.J.F., sued the Sheriff's Department and the newspaper civilly for negligent violation of the criminal statute. The Department settled with B.J.F. for $2,500. The newspaper defended on the grounds that imposing civil sanctions under the statute in question violated the First Amendment and that its publication of B.J.F.'s name was inadvertent. The trial court ruled the statute was constitutional and directed a verdict on the issue of negligence, finding the newspaper negligent *per se.* The jury awarded $75,000 compensatory damages and $25,-000 in punitive damages.

An intermediate appellate court affirmed the trial court and the Supreme Court of Florida declined review. The

7. Florida Stat. § 794.03 (1987).

Florida Star appealed to the Supreme Court of the United States which held that "where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, *only when narrowly tailored to a state interest of the highest order....*" 491 U.S. at 541, 109 S.Ct. at 2613. (Emphasis added.) The conclusion that holding The Florida Star civilly liable pursuant to the Florida criminal statute violated the First Amendment was reached in reliance upon the limited First Amendment principle set forth in *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), in a synthesis of prior cases: " '[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.' " (Citations omitted.) 491 U.S. at 533, 109 S.Ct. at 2609. A triad of considerations was demonstrated in the cases synthesized in *Daily Mail:* first, the government has "ample means of safeguarding significant interests upon which publication may impinge" since the publication of only lawfully obtained information is protected, *id.;* second, punishing the press for publication of information already publicly available is relatively unlikely to further the interest for which the state seeks to act, 491 U.S. at 535, 109 S.Ct. at 2610; and third, "timidity and self-censorship" may result from permitting punishment of the media for publishing truthful information. *Id.*

In applying the *Daily Mail* principle to *Florida Star*, the Supreme Court found the published article contained truthful information lawfully obtained and involved a matter of paramount public importance: "the commission, and investigation, of a violent crime which had been reported to authorities." 491 U.S. at 537, 109 S.Ct. at 2611. *Florida Star* also found that while there were highly significant state interests involved (protecting the privacy and physical safety from retaliation of victims of sexual offenses and a goal of encouraging such victims to fearlessly report the crimes) the method used by the state of Florida to advance

those interests was *too precipitous and extreme* to come within the *Daily Mail* principle of a "need" to use the means employed because: a) the government had, and failed to use, more limited means of deterring dissemination than the extremity of punishing truthful speech; b) the negligence *per se* standard of the civil action was too broad; and c) the Florida statute was facially underinclusive.

## II.

We begin our re-examination of the Act mindful of the teachings of *Florida Star*, and the principle that "when the validity of an act ... is drawn in question, and even if a serious doubt of constitutionality is raised, ... [we] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Mr. Justice Brandeis, concurring). Application of the principle requires resistance to the risks of producing futile results, or an unreasonable result " 'plainly at variance with the policy of the legislation as a whole.' " *Shapiro v. United States*, 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787 (1948).

The Act is legislation which permits wiretapping-eaves-dropping by law enforcement officials or officers in Pennsylvania under circumstances intended to prevent an exposure of the citizens of the Commonwealth to unjust and improper invasions of their privacy. It contains a comprehensive schema. By whom and under what circumstances a citizen's privacy in wire and oral communication may be intercepted is set forth. One method of authorized interception is by way of a court order issued upon a showing of probable cause. 18 Pa.C.S. §§ 5708–10, 5712–14. Another method of authorized interception is through authorization of the Attorney General or his deputy attorney general designee (the method used in this instance),[8] or the District Attorney or his assistant district attorney designee. 18

8. See note 1, *supra*.

Pa.C.S. § 5704. A provision for the sealing of summaries of the contents of interceptions and recordings of the interceptions obtained by way of a court order is found in section 5714.[9] The language of section 5715 requiring the sealing of applications, final reports, orders granted pursuant to the Act, supporting papers and monitor's records does not explicitly include "transcriptions of recorded interceptions." [10] The Act palpably reveals the state's interest in protecting its citizens from illegal and abusive invasions of

9. 18 Pa.C.S. § 5714 states:

§ **5714. Recording of intercepted communications**

(a) **Recording and monitoring.**—Any wire or oral communication intercepted in accordance with this chapter shall, if practicable, be recorded by tape or other comparable method. The recording shall be done in such a way as will protect it from editing or other alteration. Whenever an interception is being monitored, the monitor shall be an investigative or law enforcement officer certified under section 5724 (relating to training), and where practicable, keep a signed, written record which shall include the following:
(1) The date and hours of surveillance.
(2) The time and duration of each intercepted communication.
(3) The participant, if known, in each intercepted conversation.
(4) A summary of the content of each intercepted communication.

(b) **Sealing of recordings.**—Immediately upon the expiration of the order or extensions or renewals thereof, all monitor's records, tapes and other recordings shall be transferred to the judge issuing the order and sealed under his direction. Custody of the tapes, or other recordings shall be maintained wherever the court directs. They shall not be destroyed except upon an order of the court and in any event shall be kept for ten years. Duplicate tapes, or other recordings may be made for disclosure or use pursuant to section 5717 (relating to disclosure or use of contents of wire or oral communications or derivative evidence). The presence of the seal provided by this section, or a satisfactory explanation for its absence, shall be a prerequisite for the disclosure of the contents of any wire or oral communication, or evidence derived therefrom, under section 5717(b). [Authorizes disclosure to law enforcement officers and in testimony in criminal proceedings.]

10. Intervenor, the Attorney General of Pennsylvania, asserts the transcription in this case was not required to be sealed on the ground there are no mechanisms in the Act for sealing transcripts of interceptions authorized by the Attorney General or the District Attorney under section 5704(2)(ii). Because of our resolution of the case, the propriety of the actions of the assistant district attorney here, which would bring into play the question of the applicability of section 5715, is not a determinative factor. We, therefore, leave the question of the applicability of section 5715 to the authorizations, supporting papers,

their privacy while giving law enforcement a needed tool.[11] Unauthorized interception of wire or oral communications or improper disclosure of the contents of interceptions are felonies of the third degree.[12] Strict liability in a civil action for unlawful interception, disclosure or use is provided.[13]

Since the Act makes neither explicit exception nor authorization under any circumstances for publication by the press of the contents of wiretap transcriptions, the avoidance of a clash between First Amendment and privacy rights undergirds the remand of this case for reconsideration in light of *Florida Star*. We find Easton is not liable.

Initially we recognize the transcripts in this case do not fall within the category of recordation or transcription of interceptions intended to be protected by the Act. First, when the assistant district attorney filed a copy of the

monitor's records and contents of interceptions obtained pursuant to section 5704(2)(ii) to another day.

**11.** The debate in the House of Representatives pending passage of the Act included the following remarks:

State Representative Rhodes: "Mr. Speaker we have reached a historical point with the question of providing adequate investigative and prosecutorial tools to our prosecutors and our attorney general in Pennsylvania to deal with the problems of organized crime and official corruption. This wiretapping eavesdropping legislation we send to the Senate today must be in a position to be adopted by concurrence in the Senate if we are to meet the legislative deadlines that the House and the Senate face at this late date in the session. This is critical legislation. I think the amendment offered by Mr. Scirica properly restores the balance that we think must be in our statute to give the proper wiretapping-eavesdropping ability to law enforcement in Pennsylvania and at the same time not to expose the citizens of this Commonwealth to unjust and improper invasions of their privacy. I strongly urge the membership to support Mr. Scirica's amendment."

Legislative Journal—House of Representatives, September 21, 1978, p. 3146.

State Representative Scirica, a co-sponsor and prime proponent of the bill, stated:

"Many of the businesses in organized crime operate behind a protective shield that can only be penetrated by wiretap authority."

Legislative Journal—House of Representatives, September 21, 1978, p. 3149.

**12.** See note 5, *supra.*

**13.** See note 4, *supra.*

transcript with the Clerk of Courts, Criminal Division, it went in the public domain, irrespective of whether or not the action of the assistant district attorney was inadvertent.[14] The lodging of the transcription in the clerk's office with no notations restricting access or disclosure made it public record. The intent of the law enforcement official, while relevant to an action brought by an aggrieved person against a law enforcement officer or public official for removal from office or employment under section 5726,[15] does not prevent the transcript from being in the public domain as a matter of public record thereafter. *Florida Star*, 491 U.S. at 537, 109 S.Ct. at 2611, 2612. It is to be noted that when Mr. Boettger's discovery motion was made, it could have been, but was not, accompanied by a request for the Commonwealth's response to be placed under seal.

Second, it cannot be said that the information in the transcripts fell within the class of conversations intended to be protected by a state interest of the highest order. The excerpts from the tapes printed in the news story show, *inter alia*, discussions about gambling on college football games and whether Mr. Dickinson would be permitted to continue to bet given his indebtedness to Mr. Boettger. This is precisely the type of conversation sought to be

---

**14.** The assistant district attorney testified that his actions here were the practice in his county when discovery requests are made. N.T. pp 212, 213. According to the Attorney General, it is standard practice in this state not to seal transcripts of interceptions made under § 5704(2)(ii). Brief for Attorney General, p. 19.

**15.** **§ 5726. Action for removal from office or employment**
   (a) **Cause of action.**—Any aggrieved person shall have the right to bring an action in Commonwealth Court against any investigative or law enforcement officer, public official or public employee seeking the officer's, official's or employee's removal from office or employment on the grounds that the officer, official or employee has intentionally violated the provisions of this chapter. If the court shall conclude that such officer, official or employee has in fact intentionally violated the provisions of this chapter, the court shall order the dismissal or removal from office of said officer, official or employee.
   (b) **Defense.**—It is a defense to an action brought pursuant to subsection (a) that the actor acted in good faith reliance on a court order or the provisions of this chapter.

uncovered by the authorized interceptions of the Act. The state's interest in protecting our citizens' right to privacy does not extend to protecting a "right to privacy" in illegal endeavors. In a debate in the House of Representatives [16] over the adoption of an amendment seeking to eliminate mandatory cooperation by telephone companies, the following concern about the ability of law enforcement authorities to trace intercepted conversations of criminal activities was vigorously expressed:

Mr. BRUNNER, Mr. Speaker, maybe this is not responsive to your question, but it is my judgment that at the present time, under the present law, if one party to the conversation consents, the agency can monitor that phone call. You can do that today, and they do it in the cases of obscene telephone calls. As long as one party consents to the monitoring, this can be done.

Mr. WAGNER. I am not sure. I do not think that can be done for a criminal prosecution on that. At any rate—and I hope Mr. Scirica is listening and can answer this when I am finished—this is my concern: The kidnapping raises a unique problem, but I am concerned about *blackmail;* I am concerned about *extortion;* I am concerned about the *numbers racket;* and I am concerned about *drug smuggling. When you are in the numbers racket, when you are in drug smuggling, the person who is involved does not call people up and say, hey, do you want to gamble on tonight's race or, hey, I have got 10 pounds of heroin.* He does not do that. He is at one location, and he only handles incoming calls. It will do no

---

16. While the Court is not bound to accept the statements made in floor debates, we may look at the legislative history and floor debates held during the consideration and passage of the Act only as guides to the legislative intent in our clarification of this ambiguous and opaque aspect of the statute. Unquestionably the starting point in statutory construction is always the language of the statute. However, when a statute is unclear a court "may embark upon the task of ascertaining the intent of the legislature by reviewing the necessity of the Act, the object to be attained, circumstances under which it was enacted and the mischief to be remedied. 1 Pa.C.S. § 1921(c)." *Coretsky v. Board of Commissioners of Butler Township,* 520 Pa. 513, 517–18, 555 A.2d 72, 74 (1989).

good to the law enforcement people to know what is being sold. They do not want to know if someone is selling so many kilos or so many pounds of narcotics. It does not make a difference to them. They have to know where the calls are coming from. I do not think the contents of the conversation are as important as the source. In a lot of types of crimes, you would have to know the source of them. I think with your amendment we would lose this tool.

Mr. BRUNNER. In response, I would just say that my amendment certainly places a premium on an individual's right to privacy. But more than that, I believe, as I pointed out earlier, the cost-benefit ratio, the way the bill is presently written, does not justify the inclusion of the present language. My amendment would simply place this whole matter back in perspective, particularly with regard to cost and with regard to the benefit that the present language would provide, in addition, of course, to the right of privacy that we are talking about.

MR. WAGNER. Thank you, Mr. Speaker.

Mr. Speaker, I am not aware of the cost. I do not understand electronic equipment. Quite frankly, I do not really care what the costs are. *When you are dealing with the numbers racket and you are dealing with narcotics,* you have to know where the calls are coming from. It does very little to know what they are saying. It is obvious. You tap a phone; you know what is being said. *Numbers are being exchanged over the telephone; orders for drugs are being placed;* deliveries are being made; it is all set up. You have to know where the calls are coming from.

I think if you go along with the amendment, you are going to seriously take away this tool from law enforcement, aside from the cost. (Emphasis added.)
Legislative Journal–House of Representatives September 21, 1978, pp. 3150–51.

Third, the effect of the denial of the motion to suppress was to officially remove any arguably intended protection

of the transcript by the Act. Section 5721(b) [17] details the procedure to be used when a motion to suppress has been filed. It is glaringly silent on the effect of a denial of a motion to suppress for the obvious reason that the evidence gained by the interception, if not suppressed, will be used in adversarial judicial proceedings and thus in the public domain. To conclude to the contrary would produce an absurd result, violating legislative intent. 1 Pa.C.S. § 1922(1). [18] This we may not do. *Goodman v. Kennedy*, 459 Pa. 313, 329 A.2d 224 (1974). *See also, Lehigh Valley Co-op, Farmers v. Commonwealth, Bureau of Employment Security, Department of Labor and Industry*, 498 Pa. 521, 447 A.2d 948 (1982); *Zimmerman v. O'Bannon*, 497 Pa. 551, 442 A.2d 674 (1982); *Schaefer v. Hilton*, 473 Pa. 237, 373 A.2d 1350 (1977); *Commonwealth v. Kates*, 452 Pa. 102, 305 A.2d 701 (1973). The court order denying the motion to suppress placed the contents of the wiretapped conversation squarely into that category of evidence which is neither privileged nor protected.

Further, the trial court as well as the Superior Court and this Court in *Boettger I* erroneously and without support therefor, concluded the order referred to in section 5725(c), which provides a statutory defense of "good faith reliance on a court order or the provisions of th[e] chapter", must be an order unsealing the transcript of the wiretap. The explicit language of the section says "a court order"; it does not say "a court order authorizing disclosure"; it does not say "a court order to unseal." And the definitional section of the Act, section 5702, does not contain a definition of "a court order."

We look into the legislative history of the Act for the General Assembly's intent as to this statutory defense and

17. See note 3, *supra*.

18. **§ 1922. Presumptions in ascertaining legislative intent**
    In ascertaining the intention of the General Assembly in the enactment of a statute the following presumptions, among others, may be used;
    (1) That the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable.

find the House of Representatives decided to remove the language "A good faith reliance on a court order authorizing the interception shall constitute a complete defense to a civil or criminal action" because it was deemed to be unnecessary.[19] However, after conference when the bill was finally passed by both bodies, the language "good faith reliance on a court order" had been inserted. This history reflects the earlier, stricken language was not intended to be reinserted. If it had been so intended, the General Assembly would have enacted the previously eliminated language. Moreover, to find otherwise is an anomaly that disregards two cardinal principles of statutory construction: "[T]he General Assembly does not intend to violate the Constitution of the United States...." and "[T]he General Assembly intends to favor the public interest as against any private interest." 1 P.C.S. § 1922(3) and (5). The teachings of *Florida Star* tell us that to disallow the reliance of Easton upon the court order as a defense to the civil suit is to run afoul of the constitutional infirmity of "timidity and self-censorship"

which may result from allowing the media to be punished for publishing certain truthful information. *Cox Broadcasting [Corp v. Cohn ] supra*, 420 U.S. [469] at 496, 43 L.Ed.2d 328, 95 S.Ct. 1029 [at 1046]. Cox Broadcasting noted this concern with overdeterrence in the context of information made public through official court records, but the fear of excessive media self-suppression is applicable as well to other information released, without qualification, by the government. A contrary rule, depriving protection to those who rely on the government's implied representations of the lawfulness of dissemination, would force upon the media the onerous obligation of sifting

**19.** Mr. Scirica. What we are taking out in the section that you are referring to is the provision that says: "A good faith reliance on a court order authorizing the interception shall constitute a complete defense to a civil or criminal action ..." In my opinion, it is not necessary. We provide that the violation must be a willful one, not an inadvertent one, and we wanted to tighten the bill as much as we possibly could. For that reason I am asking to amend it out. Legislative Journal–House of Representatives September 21, 1978, p. 3147.

through government press releases, reports, and pronouncements to prune out material arguably unlawful for publication. This situation could inhere even where the newspaper's sole object was to reproduce, with no substantial change, the government's rendition of the event in question.

*Florida Star,* 491 U.S. at 535–536, 109 S.Ct. at 2610.

The newspaper, awaiting the written issuance of the order denying the suppression motion, delayed publication until receipt thereof. Clearly this was "good faith reliance upon a court order."

Finally, the press, in these United States, serves a public purpose although it is a private enterprise. "The Press Clause [of the First Amendment] focuses specifically on the liberty to disseminate expression broadly and 'comprehends every sort of publication which affords a vehicle of information and opinion.' *Lovell v. Griffin,* [303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938)]." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 800, 98 S.Ct. 1407, 1428, 55 L.Ed.2d 707 (1978) (Chief Justice Burger concurring). It is the freedom of dissemination of information and ideas of public importance that is the bonding agent in a democracy. Without dispute, it is in the public interest to have a free press. Thus the legislature intended for the public interest in a free press to supersede the interests of an individual whose private conversation regarding his illegal activities [20] had been lawfully intercepted and lawfully obtained by a newspaper. Therefore, we conclude Easton presented a valid defense under section 5725 of the Act.

Accordingly, the judgment of the Superior Court reversing the court of common pleas is affirmed.

**20.** The dissent in the *Florida Star v. B.J.F.,* 491 U.S. 524, 543, 109 S.Ct. 2603, 2614, noted agreement with *Boettger I*'s striking a balance between an individual's right to privacy and "the interest in public disclosure of such private telephone communications" in favor of the former. 491 U.S. at 551, n. 4, 109 S.Ct. at 2618, n. 4. Yet Mr. Justice White (author of the dissent) also stated "Surely the rights of those accused of crimes and those who are their victims must differ with respect to privacy concerns...." 491 U.S. at 545, 109 S.Ct. at 2615.

LARSEN and McDERMOTT, JJ., did not participate in the consideration or decision of this case.

CAPPY, J., files a concurring opinion.

ZAPPALA, J., files a dissenting opinion in which PAPADAKOS, J., joins.

CAPPY, Justice, concurring.

I join the majority opinion of Mr. Chief Justice Nix in this case. Perhaps out of an overabundance of caution, however, I write separately to emphasize that which I believe to be paramount in all cases requiring a balancing of competing constitutional rights.

As Justice Marshall notes in *Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989), there are special problems raised by cases such as this one, cases which involve "the tension between the right which the First Amendment accords to a free press, on the one hand, and the protections which various statutes and common law doctrines accord to personal privacy against the publication of truthful information, on the other...." 109 S.Ct. at 2607.

Given the vital importance in American life—and in American constitutional law—*both* of personal privacy rights *and* of the interests of the media in truthful publication, the *Florida Star* Court advised appellate courts to take special care to avoid making overly broad decisions in this area. As the Court reasoned, "the sensitivity and significance of the interest presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." 109 S.Ct. at 2609.

In *Florida Star*, which has required the remand of the instant action, Justice Marshall repeatedly comments on the limited and fact-bound nature of decisions involving the balancing of privacy and press. I believe it is important to heed that warning. It is never simple to balance the constitutional rights of one citizen against the constitutional

rights of another citizen, knowing full well that the outcome will require a derogation of the rights of one of the litigants.

Thus, the role of the court is to tread lightly, to balance carefully and to decide each case only on the facts before it. We do not and should not sweep with so broad a brush that we have limited ourselves in future cases in which the facts would compel a different outcome. As Justice Marshall states, "we have emphasized each time that we were resolving this conflict only as it arose in a discrete factual context." 109 S.Ct. at 2607.

This area of law demands such a rigorous, case-by-case development. To do otherwise is to give short shrift to the important constitutional interests that may arise in this Court in the future. Recognizing that the majority performed the delicate balancing required, I enthusiastically join its opinion.

ZAPPALA, Justice, dissenting.

I cannot concur in the majority's tortuous attempt to coerce the result in this case into cohering to what it *perceives* is a directive from the federal Supreme Court to supply sufficient predicates to reverse our prior holding. In so doing, the Majority strains the bounds of logic to reach an unnecessary and unwarranted conclusion, again deferring to our federal brethren rather than independently applying its own commonwealth's body of constitutional precedent and principle. It is clear to this writer that the holding reached by the U.S. Supreme Court in *The Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) has no effect upon the decision reached by this court in (*Boettger I*), *Boettger v. Loverro and Easton Publishing Company*, 521 Pa. 366, 555 A.2d 1234 (1989).

The Majority distills the holding of the *Florida Star* decision to its essence with the statement that "where a newspaper publishes truthful information which it has lawfully obtained, punishment may lawfully be imposed, if at all, *only when narrowly tailored to a state interest of the*

*highest order....."* 491 U.S. at 541, 109 S.Ct. at 2613, 105 L.Ed.2d at 460 (Emphasis added) Maj. Opinion at p. 715. Having thus framed the holding, the majority completely ignores or abdicates its duty to examine the case sub judice in terms of that self same language. It is patently clear to this writer that the predicate for the relief granted in *Boettger I* was indeed narrowly tailored to a state interest of the highest order. What unquestionably distinguishes *Florida Star* from the case before us is the fact that in *Boettger* we are dealing with a strict statutory scheme which is in derogation of a basic constitutional right, the right to privacy, whereas in *Florida Star*, no such right existed in the material of which publication was prohibited. Thus, contrary to *Florida Star*, there *is* implicated a state interest of the highest order.

Having made that distinction, it would have been the next logical step for the majority to have looked at the reasoning of *Boettger I* and examined whether the sanctions set forth in the Act were indeed narrowly tailored to protect that interest. Analyzing the Act in terms of the right derogated, one comes away with the obvious conclusion that the balance was properly struck.

The *sole* purpose of the Act was to give to *law enforcement agencies* the tools of eavesdropping and electronic surveillance, tools which previous to the passage of the Act had been strictly prohibited given the individual's right to privacy. The passage of the Act was a limited sacrifice to that right. Because of this, the *use* of information derived from the tools provided by the Act is strictly regulated, for the investigative and/or prosecutorial use of this intercepted information is the raison d'etre for the Act's existence. Without the Act this information would not be available to *anyone* in any form. Only when the information derived from the use of the Act is disclosed pursuant to its provisions, *as evidence introduced in open court*, does that same information then lose its character and protection as provided by the Act. I cannot fathom how it can be said that this limitation is unreasonable or that it works a

hardship upon the media or the First Amendment. The prohibition is not blanket as to the media, but neither is the protection absolute as to the individual. Each has the possibility that its respective right may be infringed upon. That is the proper balance.

This is not a situation where the media is being precluded from disclosing something that, but for the legislation, it would be free to do. This is clearly the distinguishing feature of the case sub judice and its relation to the *Florida Star* scenario. This is a situation where, but for the legislation, the disclosure would be absolutely illegal. Reasoning from this premise, the majority in *Boettger I* distinguished the present factual situation from those presented in the *Cox* line of cases, *Smith v. Daily Mail Publishing Company*, 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975); *Landmark Communications Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); *Oklahoma Publishing Company v. District Court of Oklahoma*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977). In so doing, we especially made note of the question, unanswered by the Court in the *Landmark* case, to wit, whether the publication of truthful information, withheld by law from the public domain, enjoyed the same privilege as publication for otherwise public information contained in court records. That question presented itself in the case sub judice and, applying the balancing test set forth in *Boettger I* and above, we deemed the interests in the citizens of this Commonwealth's right to privacy were dominant given the factual situation presented. In so holding, we answered the question unanswered in *Landmark* according to our interpretation of the Pennsylvania Constitution. The same question was not presented in *Florida Star*, nor did the court there have reason nor inclination to address it. Nothing in the order of remand in the instant case states or suggests that we decided the question incorrectly. The order merely requests that we examine the case in light of the decision reached by that court in *Florida*

*Star.* This writer has done so and finds no reason whatsoever to change the result reached previously. Nor does he see the remand as a mandate to do so. The cases, as stated, are clearly distinguishable and Florida Star should have no bearing on our decision in *Boettger I.* Had the federal court in *Florida Star,* been presented with the unanswered question presented in *Landmark,* and a different result than that reached by this court in *Boettger I* had obtained, I would deem it incumbent to then reevaluate the result of our first disposition in light of this state's constitution. This, however, did not occur, and I see no reason to reach a different result, save a majority of this Court's undying desire to seek the approval of its federal brethren.

I must also take issue with several of the majority's factual predicates which simply cannot be justified and perhaps in large part led to the strained ratio decendi thus obtained. First the majority finds that the transcript of the recordings here challenged were not themselves of the category of protected interceptions as intended by the Act. Maj. Opinion at pp. 519–520. This major assumption is stated without justification nor citation to authority, instead attempting to justify the transformation into unprotected conversation by placing the blame of the transcript being "unsealed" and in the public domain upon Mr. Boettger for failing to request that the same be sealed. This is most patently a red herring. It would have been a useless act to request something that, by law, is presumed to be done. As we stated in *Boettger I,* it is indeed unfortunate that the District Attorney chose to place this protected information in a public file, however that act, in and of itself, did not change the attributes nor the prohibitions of the Act on the *disclosure* of the information. That the newspaper, or any other individual for that matter, had access to the transcript at that stage misdirects the inquiry as to the proscriptions of the Act. It was not the access, but the *disclosure* of the contents of the intercept which were prohibited. It would indeed be naive to assume that the reporter did not know the transcript was of an intercept authorized by the Act. It

is clear that his intention at the suppression hearing was to gain access to the contents of the intercept. When they were not forthcoming at the hearing, the reporter sought them in the Clerk's office. That he found them there is undisputed, that he was authorized to disclose them at that time is the issue. I would hold that under the provisions of the Act, he was not.

While the majority makes much of the newspaper's forbearance from disclosure of the transcript until after the suppression court's order was filed, I find this not to be "reasonable reliance" on a court order so much as it is evidence of the newspaper's "mens rea" as to the provisions of the Act, thus strengthening the position that it was aware of the prohibition from disclosure absent its disclosure first in open court.

The majority next seeks justification for its position by finding that, because the information in the transcripts contained discussions about gambling and other illegal activity, the transcripts did not fall within a class of conversations intended to be protected by a "state interest of the highest order". *Id.*, at pp. 521–524. This presumption is ludicrous and completely without support. The *content* of the conversation is not germane, it is the *interception* and *disclosure* which is protected, regardless of its *later* perceived significance or illegality. Nowhere in the Act is it provided that at the moment it is deemed an intercepted conversation concerns illegal activity, the provisions of the Act disappear and the conversation can be disclosed to the world. Where the interception would otherwise be prohibited, the application of a hindsight test would be absurd.

Finally, the majority holds that the act of denying the motion to suppress the use of the intercepts removed any protections intended by the Act. It reasons that the Order denying suppression, was an order under § 5725 of the Act, which provides a defense to those in the position of the Appellant who disclose protected conversation for "good faith reliance on a court order". This finding again not

only misperceives the functioning of the Act, but in effect guts it.

Nowhere in the Act is it provided that, upon the denial of a motion to suppress intercepted evidence, it may be disclosed. Such a result may be presumed, if at all, only by those *authorized* by the Act to so disclose. Those authorized to so disclose may only do for the purpose of using the information obtained under the Act as evidence in open court. *This* was the *intended* and *sole* purpose of the Act. If, throughout this whole matter, the Appellee here chose to plead nolo contendre before trial, as he did, or, if the District Attorney, for any reason, deemed it unnecessary to use the evidence obtained in open court, as is his perogative, then the evidence obtained under the provisions of the Act would not have been disclosed by those authorized to do so in open court and therefore the contents could not have been thus disclosed by Appellant. Only at that particular point in time where the protected information was used as evidence in open court by one so authorized, could the Appellant have safely published, in 24 point type if he so desired, every word, colloquialism, expression and off color comment that had been revealed.

This result is clearly proper and comports undeniably with the letter and spirit of the Act. It is the only result which validates the Act's ability to derogate the citizen's right to privacy in his most intimate conversations, legal or otherwise. That validity rests on the predicate that the use of the information gathered is a strong tool for the *prosecution of crime* to be used by *law enforcement officials.* It is *only* for that purpose. It's collection and disclosure is *only* permitted in furtherance of that purpose. If that purpose or use becomes unnecessary, so does the possession and use of the information by those authorized officials as well as the general public. The only time a media or individual's interest in that information becomes operative is upon its disclosure and use in open court, as no one would deny it then should.

This result assures the confidence of our citizenry that the Act, while a necessary burden on their liberties, will be strictly policed so as to ensure that it will not be abused. This Court has stated that we would strictly enforce the provisions of the Act for exactly that purpose. *Commonwealth v. Hasham*, No. 152 E.D. Appeal Dkt. (Filed January 4, 1991), slip opinion at p. 8.

For these reasons I dissent from the about face of my brethren in the majority and would affirm the decision reached by this Court in *Boettger I* based upon the distinctions between that case and *Florida Star*, as the U.S. Supreme Court requested that we consider.

PAPADAKOS, J., joins in this dissenting opinion.